George HOGAN, et al.,
Plaintiffs, Appellees,

v.

Margaret HECKLER,
Defendant, Appellee,

Phillip Johnston, et al.,
Defendants, Appellants.

No. 85–1149.

United States Court of Appeals,
First Circuit.

Argued June 4, 1985.

Decided Aug. 12, 1985.

As Amended Aug. 20, 1985.

Rehearing En Banc Denied Sept. 18, 1985.

H. Reed Witherby, Asst. Atty. Gen., Boston, Mass., with whom Francis X. Bellotti, Atty. Gen., Boston, Mass., was on brief, for appellants.

John F. Cordes and Nicholas S. Zeppos, Appellate Staff, Civil Div., Washington, D.C., with whom Richard K. Willard, Acting Asst. Atty. Gen., Washington, D.C., and William F. Weld, U.S. Atty., Boston, Mass., were on brief, for appellee Margaret

* Of the Federal Circuit, sitting by designation.

Heckler, Secretary, Dept. of Health and Human Services.

Steven A. Hitov, Western Massachusetts Legal Services, for appellees, George Hogan, et al.

Before CAMPBELL, Chief Judge, and DAVIS * and TORRUELLA, Circuit Judges.

LEVIN H. CAMPBELL, Chief Judge.

This is an appeal from a judgment by the United States District Court for the District of Massachusetts in a class action brought by Medicaid applicants against the Massachusetts Commissioner of Public Welfare and Secretary of Human Services ("state defendants") and the United States Secretary of Health and Human Services ("the Secretary") challenging the use in the state's Medicaid program of a six-month budget period for the deduction of medical expenses for the plaintiff class of applicants and the Secretary's regulation which allowed Massachusetts to adopt this requirement. The district court held that the challenged provisions were invalid because they conflicted with sections 1902(a)(17) and 1902(a)(10)(C)(i)(III) of the Social Security Act, 42 U.S.C. §§ 1396a(a)(17) and 1396-a(a)(10)(C)(i)(III). *See Hogan v. Heckler,* 597 F.Supp. 1106 (D.Mass.1984). We reverse.

I. *Statutory Background*

In order to understand plaintiffs' claim it is useful to review first the statutory set up of the Medicaid program.

Medicaid was established in 1965 through Title XIX of the Social Security Act as a cooperative federal and state cost-sharing venture for the provision of basic medical services to eligible applicants, Pub.L. No. 89–97, 79 Stat. 343 (1965), as amended, 42 U.S.C. §§ 1396 *et seq.* States choosing to participate in the program are required to follow federal guidelines, 42 U.S.C. § 1396. The United States Secretary of Health and Human Services (for-

merly the Secretary of Health, Education and Welfare) is entrusted with the administration of the Act and must approve the state plans of medical assistance before the participating states are allowed to receive any federal monies. The Secretary's regulations are entitled at least to deference and, when promulgated in accordance with an explicit statutory delegation, to "legislative effect". *See Schweiker v. Gray Panthers*, 453 U.S. 34, 44, 101 S.Ct. 2633, 2640, 69 L.Ed.2d 460 (1981); *see also Connecticut Department of Income Maintenance v. Heckler*, — U.S. —, 105 S.Ct. 2210, 2214, 85 L.Ed.2d 577 (1985). Massachusetts has chosen to participate in the Medicaid program, Mass.Gen.Laws Ann. ch. 118E, § 1 *et seq.* (West Supp.1985).

The Medicaid statute covers two types of beneficiaries. First, it covers low income individuals who come within certain federal cash assistance programs—Supplemental Security Income for the Aged, Blind and Disabled ("SSI") and Aid to Families with Dependent Children ("AFDC"). Such persons automatically qualify for Medicaid, 42 U.S.C. § 1396a(a)(10)(A). They are referred to as "categorically needy."[1] Second, a state may provide Medicaid to certain so-called "medically needy" persons who meet the categorical requirements for SSI or AFDC (i.e., aged, blind or disabled persons, or families with dependent children) but whose income or assets exceed the limits that would qualify them for these programs, 42 U.S.C. § 1396d(a). A state participating in the Medicaid program is under no obligation to provide coverage for the medically needy, *see Schweiker v. Hogan*, 457 U.S. 569, 591–92, 102 S.Ct.

2597, 2610–11, 73 L.Ed.2d 227 (1982), but if it chooses to do so, it is subject to some federally-imposed conditions, including that the standards used to determine eligibility be "reasonable" and "comparable for all groups," 42 U.S.C. § 1396a(a)(17), and that the methodology employed to determine their eligibility be the "same methodology" which would be employed to determine eligibility for the related categorically needy group, 42 U.S.C. § 1936a(a)(10)(C)(i)(III). Massachusetts has opted to provide coverage to medically needy persons, Mass.Gen. Laws Ann. ch. 118E, § 1 (West Supp.1985).

Eligibility for a medically needy applicant is determined in the following manner. First, his gross income is calculated. Next, several deductions are applied to determine the applicant's "countable income," *see* 42 C.F.R. § 453.831(a); 106 C.M.R. §§ 505.-200, 506.100–200. Then, the countable income figure is compared to the appropriate income standard, which in most (though not all)[2] instances, is comparable to the corresponding SSI or AFDC standard of need. If the applicant's countable income is equal to or less than the standard, the applicant is eligible for Medicaid, *see* 42 C.F.R. § 435.831(b); 106 C.M.R. § 506.400. Up to this point, the procedure is similar to the procedure followed in determining eligibility for SSI or AFDC categorically needy. Thus, countable income is computed on a monthly basis,[3] as both SSI and AFDC have, since 1981, been required by statute to use a one month budget period; *see* 42 U.S.C. §§ 1382(c)(1) [for SSI] and 602(a)(13) [for AFDC]. Likewise, the deductions available to a medically needy applicant must be the same as those available to a

**1.** Originally, the states ran the Medicaid categorically needy programs. Coverage was provided for persons qualifying under four federal cash assistance programs: Old Age Assistance, Aid to the Blind, Aid to the Permanently and Totally Disabled and Aid to Families with Dependent Children. In 1972, the first three were consolidated into the SSI program, with the federal government assuming responsibility for funding payments and setting standards of need, Pub.L. No. 92–603, 86 Stat. 1465 (1972).

**2.** As plaintiffs point out in their brief, the maximum income eligibility limits for some AFDC

related medically needy applicants are, in the cases of small (one to three persons) families, higher than those used for AFDC coverage. *Compare* 106 C.M.R. § 506.410 with 106 C.M.R. § 304.410. This means that, for these groups, medically needy applicants are eligible for Medicaid without a spenddown. *See* text, *infra.*

**3.** Actually, Massachusetts regulations provide for the use of a six month budget period, 106 C.M.R. § 505.300, but income is converted to monthly amounts before being used in eligibility calculations, *see* 106 C.M.R. § 505.320.

categorically needy applicant of the corresponding program. *See* 42 C.F.R. § 435.-831(a); *cf.* 106 C.M.R. §§ 506.100–200.

However, since by definition the medically needy possess income in excess of the limits imposed by the SSI and AFDC programs, the determination of their Medicaid eligibility involves an extra factor not considered for categorically needy eligibility. Medically needy applicants are required to "spend down" their excess income by incurring medical expenses that reduce their net countable income to the amount of the eligibility standards. *See* 42 U.S.C. § 1396a(a)(17); 42 C.F.R. § 435.831(c); 106 C.M.R. §§ 506.500 *et seq.* Put another way, medically needy applicants are allowed a special deduction for their medical expenses, to reduce their income to the Medicaid eligibility levels. The difference between the applicant's income and the Medicaid eligibility income standard, i.e. the amount of medical expenses that the applicant must incur to qualify, is called the "spenddown".

Unlike in the computation of countable income, there is no express statutory or regulatory requirement that an applicant's "spenddown" be computed on a monthly basis. To the contrary, in a regulation dating back to the inception of the Medicaid Act, the Secretary has allowed states to "use a prospective period of not more than six months to compute income," 42 C.F.R.

§ 435.831. Following this guideline, the state of Massachusetts, like others, has adopted a six month budget period for the determination of the spenddown of a medically needy applicant, Mass.Gen.Laws Ann. ch. 118E, § 10 (West Supp.1985);[4] *see also* 106 C.M.R. § 506.510.[5] This means that an applicant is required to incur medical expenses at least equal to his total excess income during a period of six months, that is, to incur, within a six month period, an amount of medical expenses at least equal to six times his monthly excess income, *see* 106 C.M.R. § 506.520 ("The spenddown liability is determined by multiplying the excess monthly income by six."). To take an example used by the district court: an applicant whose monthly income is $100 above the appropriate standard of eligibility must spend, within the corresponding six month period,[6] a sum of $600 in medical expenses to achieve Medicaid eligibility. *See Hogan v. Heckler,* 597 F.Supp. at 1108.

According to the state defendants, the purpose of this requirement is to average out the amount of medical expenses that an applicant will be able to deduct in order to insure that the limited resources devoted to the medicaid program go to those persons that have considerable, recurrent expenses.[7] However, although the requirement, as framed by the state, assumes that an applicant has six months' excess income

---

**4.** This statute provides, in pertinent part,

In any case where the monthly income of a recipient or beneficiary is in excess of the exemptions allowed, the recipient or beneficiary shall be liable to pay the provider of medical care or service an amount which shall be equal to the excess income for a period of six consecutive months, which includes the period when such service was provided.

Mass.Gen.Laws Ann. ch. 118E, § 10 (West Supp. 1985).

**5.** This regulation provides,

The spend-down period is a six (6) month prospective period which starts on the first day of the month of service of the earliest bill used to meet the spend-down amount. This date shall not be earlier than three (3) months prior to the month of application and shall not extend more than six months from the first day of application.

106 C.M.R. § 506.510

**6.** According to the Massachusetts regulations, an applicant cannot submit medical expenses incurred earlier than three months prior to the month of application or later than six months after the first day of the application, *see* 106 C.M.R. § 506.510, note 5, *supra.*

**7.** The Massachusetts Medicaid program would, for example, provide coverage to a medically needy applicant who has a spenddown of $600 but who has monthly regular medical expenses of $100 or more during the applicable six month period. It would not, however, provide coverage to an applicant with a similar spenddown who has to incur a single extraordinary expense, say $300, during one of the months of this period, even though for that month, the latter's need clearly exceed the former's.

available at the time of application, an applicant is not allowed to anticipate future medical expenses unless he is institutionalized at a long term care facility, *see* 106 C.M.R. § 506.620. This means that applicants in a noninstitutional setting must often wait several months until their accumulated medical expenses equal their spenddown amount. Taking our above example of an applicant who has $100 monthly excess income, yielding a $600 spenddown, if that person has regular medical expenses of, say, $115 a month, then he will not become eligible until the last month of the six month budget period,[8] even though for every month in that period his medical expenses have surpassed his excess income. Moreover, as Medicaid eligibility is redetermined at the close of each six month period, *see* 106 C.M.R. § 506.580, the applicant is forced into a new wait every time. A person in this predicament is forced either to operate on credit while his medical bills accumulate to reach his spenddown amount or to incur higher cost medical care to spend down his excess income faster. See *Hogan v. Heckler,* 597 F.Supp. at 1109.[9]

## II. *Proceedings Below*

The action was originally filed in the district court in May, 1980 as *Hogan v. Harris,* No. 80–883–T, naming as defendants the Secretary and the state defendants. Plaintiffs were a group of SSI-related medically needy who challenged, on constitutional and statutory grounds, several aspects of the Massachusetts Medicaid program, including the six month spenddown period. In *Hogan v. Harris,* 501 F.Supp. 1129 (D.Mass.1980), the district court decided part of the controversy, finding unconstitutional, as applied in Massachusetts, a provision of the Medicaid Act which bars states from setting income limits for the

medically needy higher than four-thirds of the AFDC limit in the state, *see* 42 U.S.C. § 1396b(f). This decision was appealed directly to the Supreme Court, which reversed the district court in *Schweiker v. Hogan,* 457 U.S. 569, 102 S.Ct. 2597, 73 L.Ed.2d 227 (1982), and remanded the case for determination of the remaining claims (including the six month spenddown).

Thereafter, the case was consolidated with *Carter v. Gallant,* No. 83–119–T, a case raising an identical issue. A class of all SSI-related medically needy subject to the Massachusetts six month spenddown requirement was certified.

One representative of the plaintiff class is Don Carter, a quadriplegic requiring the services of a personal care attendant to accomplish the functions of daily life. Receiving veteran's and Social Security benefits that bring his spenddown up to nearly $2,300, Mr. Carter is assertedly forced to operate on credit, depending on the willingness of his attendant to go unpaid for months at a time, while his medical expenses accumulate to reach the required amount. At some point, Mr. Carter was abandoned by his attendant and was forced to seek emergency care at a hospital for a short spell, to increase his medical expenses. *See Hogan v. Heckler,* 597 F.Supp. at 1109. Other members of the plaintiff class are in a similar situation. Plaintiffs sought an injunction from the court ordering the state defendants to adopt a one month budget period in the computation of the spend-down of SSI-related medically needy applicants or, in the alternative, to allow non-institutionalized medically needy applicants to anticipate future medical expenses occurring within the six month period.[10]

■ After some discovery, both parties moved for summary judgment, there being

---

8. Thus, at the end of five months, his cumulative medical expenses will be $575; that is, still below the required spend-down amount of $600.

9. Alternatively, the applicant can seek institutionalized care, so that he can anticipate future expenses.

10. The defendants express sympathy for the plight of applicants in the situation of Mr. Car-

ter, but claim that the majority of the plaintiff class is made up of applicants whose medical expenses only infrequently surpass their excess income in a given month. Defendants argue that ordering the spenddown to be computed on a monthly basis, as sought by the plaintiffs, will cause the latter to schedule ordinary medical expenses (i.e., visits to the dentist, physical check-ups, etc.) for a single month in order to take advantage of Medicaid. This, they add,

no controversy as to the material facts. On November 13, 1984 the district court issued its memorandum and order, *Hogan v. Heckler,* 597 F.Supp. 1106, invalidating the use by the state defendants of a six month spenddown period. The court ruled that since Medicaid eligibility for SSI (as well as AFDC) categorically needy was limited by Congress in 1981 to determination on a monthly basis, the same became automatically true as to medically needy applicants. This followed, in the court's view, from the "reasonable standards ... comparable for all groups" and the "same methodology" language of sections 1902(a)(17) and 1902(a)(10)(C)(i)(III) of the Social Security Act, 42 U.S.C. §§ 1396a(a)(17) and 1396-a(a)(10)(C)(i)(III). Because the Secretary's regulation, as well as the Massachusetts statute, authorized a spenddown period in excess of one month, the court held that they were both void.[11] Although the remedy was still pending, the defendants sought and obtained a certification under 28 U.S.C. § 1292(b) to appeal from the district court's decision. We agreed to review.

On appeal, both the Secretary and the state defendants challenge the court's read-ing of sections 1902(a)(17) and 1902(a)(10)(C)(i)(III) of the Social Security Act. We discuss each of these provisions in turn.

### III. *"Reasonable Standards ... comparable for all groups."*

Section 1902(a)(17) requires, in pertinent part, that a state Medicaid plan must, include *reasonable standards (which shall be comparable for all groups ...)* for determining eligibility for and the extent of medical assistance under the plan ... which (A) ..., (B) provide for taking into account only such income and resources as are, as determined in accordance with standards prescribed by the Secretary, available to the applicant or recipient and ... as would not be disregarded ... in determining his eligibility for [AFDC or SSI], (C) ... (D) ...; and provide for flexibility in the application of such standards with respect to income by taking into account, *except to the extent prescribed by the Secretary,* the costs ... incurred for medical care. (Emphasis added) 42 U.S.C. § 1396a(a)(17).

While the district court relied on the language appearing at the beginning of this

would place undue strain on a program that has limited resources.

During the pendency of the litigation the Massachusetts legislature tried to deal with the problem by proposing a "targeted" one month spend-down for the chronically ill and disabled who require ongoing, non-acute health care. *See* 1983 Mass.Acts ch. 720. This proposal was disapproved by the Secretary. *See Hogan v. Heckler,* 597 F.Supp. at 1109.

11. In a different action brought in the courts of Massachusetts, a class of AFDC-related medically needy successfully challenged the six month spenddown period on essentially the same grounds as set out by the district court, *see Rivera v. Atkins,* No. 83–684 (Mass.Superior Court, March 26, 1984). Shortly after we heard argument in the instant case, the Supreme Judicial Court of Massachusetts affirmed the Superior Court in a decision which relied to a great extent on the district court's opinion, *see Rivera v. Atkins,* 395 Mass. 189, 479 N.E.2d 639 (1985). Plaintiffs have since filed a motion in this appeal arguing, for the first time, that since a one month period is now mandated for AFDC-related medically needy in Massachusetts, the state is required by 42 U.S.C. §§ 1396a(a)(10)(C)(i)(III)

and 1396a(a)(17) to provide a one month period for SSI-related medically needy as well. Plaintiffs urge us to remand to the district court in order to allow the judge to consider this new argument. Both the Secretary and the Commonwealth strenuously oppose the request, pointing out that if we uphold the legality of the six month period, the state can ask the Massachusetts court to vacate its opinion, based, as it is, mainly on the district court's construction of the federal law. The state defendants, moreover, are currently petitioning for certiorari in the United States Supreme Court.

We deny plaintiffs' motion. We do not understand plaintiffs to suggest that the *Rivera* case, brought by AFDC plaintiffs without including the Secretary as a party, has any preclusive effect here. Nor are we constrained by the Massachusetts court's interpretation of the federal Social Security Act. Plaintiffs, moreover, failed to make this argument below, although they could have done so since the Massachusetts Superior Court rendered its decision before the motion for summary judgment. *See Johnston v. Holiday Inns, Inc.,* 595 F.2d 890, 894 (1st Cir. 1979), *Greenwich Federal Savings and Loan Association v. Fidelity Bond and Mortgage Co.,* 714 F.2d 183, 184 (1st Cir.1983).

statute ("comparable for all groups") to rule that the spenddown period of medically needy applicants had to be the same as the one month budget period used to determine income eligibility under the categorically needy programs, defendants rely on the language contained at the bottom ("except to the extent prescribed by the Secretary") to argue that Congress delegated to the Secretary wide discretion in this area, and that we should be guided by her regulations. Defendants point out that this broad delegation has been placed by Congress precisely in the "spenddown clause" of the statute—the clause providing for the deduction of medical expenses for the medically needy. When grounded on an explicit authorization, the Secretary's regulations are entitled to great weight.[12] *See Connecticut Department of Income Maintenance v. Heckler*, —— U.S. at ——, 105 S.Ct. at 2214; *Blum v. Bacon*, 457 U.S. 132, 141, 102 S.Ct. 2355, 2361, 72 L.Ed.2d 728 (1982); *Herweg v. Ray*, 455 U.S. 265, 274–75, 102 S.Ct. 1059, 1066–67, 71 L.Ed.2d 137 (1982); *Schweiker v. Gray Panthers*, 453 U.S. at 44, 101 S.Ct. at 2640; *Quern v. Mandley*, 436 U.S. 725, 738, 98 S.Ct. 2068, 2076, 56 L.Ed.2d 658 (1978); *Batterton v. Francis*, 432 U.S. 416, 423–25, 97 S.Ct. 2399, 2404–05, 53 L.Ed.2d 448 (1977); *New York Department of Social Services v. Dublino*, 413 U.S. 405, 421, 93 S.Ct. 2507, 2517, 37 L.Ed.2d 688 (1973).

The legislative history of section 1902(a)(17) shows that in adopting the spenddown clause Congress was concerned with correcting "one of the weaknesses identified in the medical assistance for the aged program." The 1965 Senate Report explained,

Under the current provision of Federal law, some States have enacted programs which contain a cutoff point on income which determines the financial eligibility of the individual. Thus, an individual with an income just under the specified limit may qualify for all of the aid provided under the State plan. Individuals, however, whose income exceeds the limitation adopted by the State are found ineligible for the medical assistance provided under the State plan even though the excess of the individual's income may be small when compared with the cost of the medical care needed. In order that all States shall be flexible in the consideration of an individual's income, the committee bill requires that the State's standards for determining eligibility for and extent of medical assistance shall take into account, except to the extent prescribed by the Secretary, the cost—whether in the form of insurance premiums or otherwise—incurred for medical care or any other type of remedial care recognized under State law. Thus, before an individual is found ineligible for all or part of the cost of his medical needs, the State must be sure that the income of the individual has been measured in terms of both the State's allowance for basic maintenance needs and the cost of the medical care he requires.

.     .     .     .     .

The State may require the use of all the excess income of the individual toward his medical expenses, or some proportion of that amount. In no event, however, with respect to either this provision or that described below with reference to the use of deductibles for certain items of medical service, may a State require the use of income or resources which would bring the individual's income below the amount established as

---

12. Plaintiffs deny that the language appearing at the bottom of section 1902(a)(17) constitutes an explicit delegation to the Secretary. In *Schweiker v. Gray Panthers*, 453 U.S. 34, 101 S.Ct. 2633, 69 L.Ed.2d 460, the Supreme Court held that fairly similar language appearing in section 1902(a)(17)(B) ("as determined in accordance with standards prescribed by the Secretary") constituted an "explicit delegation of substantive authority" and that her definitions adopted thereunder were entitled to "legislative effect". *Id.* at 44, 101 S.Ct. at 2640. While plaintiffs contend that the differences in wording mean that Congress did not intend to give the Secretary so broad an authorization with regard to the calculation of an applicant's spenddown, we believe the language indicates, at very least, that a considerable degree of deference is owed to the Secretary in this area.

the test of eligibility under the State plan. Such action would reduce the individual below the level determined by the State as necessary for his maintenance.

S.Rep. No. 404, 89th Cong., 1st Sess., Pt. 1 (1965), *reprinted in* 1965 U.S.Code Cong. & Ad.News 1943, 2018–19 ("1965 Senate Report").

The House Report echoed this language, adding the following example,

If the test of eligibility should be $2,000 a year, an individual with income in excess of that amount shall not be required to use his income to the extent he has remaining less than $2,000. This action would reduce the individual below the level determined by the State as necessary for his maintenance.

H.R.Rep. No. 213, 89th Cong., 1st Sess., Pt. 1, p. 68 (1965) ("1965 House Report").

While it is clear from the quoted history that Congress intended that the states exercise their flexibility in favor of the applicants, who could not be required to disburse a sum that would leave them below the level of need determined by the state, Congress did not specify the procedure that states should follow to achieve this. Rather, Congress authorized the Secretary to "prescribe[ ]" the "extent" to which medical expenses were to be taken into account. We observe, moreover, that the example cited by the 1965 House Report employed a budget period of one year. The fact that Congress thought it permissible to determine the lower limit of an applicant's spenddown based on his yearly income suggests that the amount of the spenddown could be computed on a yearly basis, as well. If so, this would have implied Congressional belief that some applicants would be forced to wait until their medical expenses equaled this (relatively high) spenddown amount.

The Secretary responded to the statute by issuing, in 1966, a set of Medicaid instructions which included a provision allowing a spenddown period of up to six months, *see* HEW Handbook of Public Assistance Administration, section D–4220(A)(4) (June 17, 1966).[13] In 1969, this provision was incorporated into the first set of Medicaid regulations, *see* 34 Fed.Reg. 1321 (1969), *codified at* 45 C.F.R. 248.-21(a)(4) (1969). This regulation appears presently at 42 C.F.R. 435.831 (1985), and provides in part,

The agency must determine income eligibility of medically needy individuals in accordance with this section. The agency must use a prospective period of not more than six months to compute income.

42 C.F.R. 435.831 (1985).[14]

Plaintiffs concede that this regulation was originally valid because at the time it was adopted, there was no mandatory

---

**13.** This instruction required that a state plan for medically needy,

Provide that only such income and resources as are actually available will be considered; that income and resources will be reasonably evaluated; and that only such income and resources will be considered as will be "in hand" within a period, preferably of not more than three months, but not in excess of six months, ahead, including the month in which medical services were rendered for which payment would be made under the plan. HEW Handbook of Public Assistance Administration, section D–4220(A)(4) (June 17, 1966).

**14.** The complete text of this regulation is the following,

MEDICALLY NEEDY INCOME ELIGIBILITY

453.831 **Income eligibility.**

The agency must determine income eligibility of medically needy individuals in accordance with this section. The agency must use a prospective period of not more than 6 months to compute income.

(a) *Determining countable income.* The agency must deduct the following amounts from income to determine the individual's countable income.

(1) For individuals under age 21 and caretaker relatives, the agency must deduct amounts that would be deducted in determining eligibility under the States's AFDC plan.

(2) For aged, blind, or disabled individuals in States covering all SSI recipients, the agency must deduct amounts that would be deducted in determining eligibility under SSI. However, the agency must also deduct the highest amounts from income that would be deducted in determining eligibility for optional State supplements if these supplements are paid to all individuals who are receiving SSI or would be eligible for SSI except for their income.

budget period for either the SSI or AFDC categorical programs.[15] They claim, however, that when in 1981 Congress imposed a one month budget period for each of these programs, *see* the Omnibus Budget Reconciliation Act of 1981 ("OBRA"), P.L. No. 97–35, 95 Stat. 855 and 865 (1981), *codified at* 42 U.S.C. §§ 602(a)(13)(A) and 1382(C)(1), this period became automatically applicable to the medically needy through the comparability clause of section 1902(a)(17) which, in their view, requires identical treatment for medically and categorically needy applicants.

Defendants reply that the "comparable for all groups" language contained in section 1902(a)(17) since its origin only requires comparability *within* the medically needy groups (i.e., between the SSI-related and AFDC-related medically needy and between the subclasses within the SSI-related medically needy), not between medically and categorically needy.[16] The legislative history of section 1902(a)(17) is not completely clear in this respect. *See Schweiker v. Hogan*, 457 U.S. at 587, 102 S.Ct. at 2608. The 1965 legislative reports tend to support the defendants' position. *See* 1965 Senate Report, 1965 U.S.Code Cong. & Ad. News at 2018; 1965 House Report at 66–67.[17] However, later legislative pronouncements coincide with plaintiffs' under-

---

(3) For aged, blind, or disabled individuals in States using income requirements more restrictive than SSI, the agency must deduct amounts that are no more restrictive than those used under the Medicaid plan on January 1, 1972 and no more liberal than those deducted in determining eligibility under SSI or an optional State supplement. However, the amounts must be at least the same as those that would be deducted in determining eligibility, under § 435.121, of the categorically needy.

(b) *Eligibility based on countable income.* If countable income determined under paragraph (a) of this section is equal to or less than the applicable income standard under § 435.814, the individual or family is eligible for Medicaid.

(c) *Deduction of incurred medical expenses.* (1) If countable income exceeds the income standard, the agency must deduct from income, in the following order, incurred medical expenses that are not subject to payment by a third party.

(i) Medicare and other health insurance premiums, deductibles, or coinsurance charges, incurred by the individual or family or financially responsible relatives, including enrollment fees, copayments, or deductibles imposed under § 447.51 or § 447.53 of this subchapter.

(ii) Expenses incurred by the individual or family or financially responsible relatives for necessary medical and remedial services that are recognized under State law but not included in the plan.

(iii) Expenses incurred by the individual or family or by financially responsible relatives for necessary medical and remedial services that are included in the plan.

(2) The agency may set reasonable limits on the amounts of incurred medical expenses to be deducted from income under paragraphs (c)(1)(i) and (ii) of this section.

(d) *Eligibility based on incurred medical expenses.* Once deduction of incurred medical expenses reduces income to the income standard, the individual is eligible for Medicaid. 42 C.F.R. § 435.831 (1985).

**15.** Plaintiffs also contend that the controlling regulation here is not 42 C.F.R. § 435.831 but rather 42 C.F.R. § 435.401(c) which provides that a state medicaid agency "must not use requirements for determining eligibility for [medically needy] groups that are—... more restrictive than those used under the [state's AFDC plan or SSI]." The latter regulation, however, appears in the subpart dealing with the "General Eligibility Requirements" and refers to the "General Rules" to be employed in determining eligibility. Therefore, even if it were applicable to the present situation, it would be superseded by the more specific § 435.831 which deals with income eligibility determination for the medically needy. *See Clifford F. MacEvoy v. United States*, 322 U.S. 102, 107, 64 S.Ct. 890, 893, 88 L.Ed. 1163 (1944) ("However inclusive may be the general language of a statute, it 'will not be held to apply to a matter specifically dealt within another part of the same enactment.... specific terms prevail over the general in the same or another statute which otherwise might be controlling'".) (citing *Ginsberg & Sons v. Popkin*, 285 U.S. 204, 208, 52 S.Ct. 322, 323, 76 L.Ed. 704 (1932)).

**16.** The Secretary, however, concedes that equal treatment between medically and categorically needy is required by section 1902(a)(10)(C)(i)-(III). *See* text, *infra*.

**17.** Thus, the 1965 Senate Report expressed,

Although states may set a limitation of income and resources which individuals may hold and be eligible for aid, they must do so by maintaining a comparability among the various categorical groups of needy people.

standing. *See* 127 Cong.Rec. S9218 (daily ed. August 3, 1981) (statement of Sen. Dole) ("Moreover, it is not the intent of the conferees to alter the requirements under section 1902(a)(17) of the Social Security Act relating to comparable treatment of income and resources between categorically needy and medically needy programs."); *id.* at H5804 (daily ed. July 31, 1981) (statement of Rep. Waxman) (same); *id.* at H5813 (daily ed. July 31, 1981) (statement of Rep. Dingell) (same).[18] Also, some courts have read section 1902(a)(17) as requiring equal treatment between categorically and medically needy. *See Beltran v. Myers,* 701 F.2d 91, 93 (9th Cir.) (per curiam), *cert. denied,* 462 U.S. 1134, 103 S.Ct. 3115, 77 L.Ed.2d 1369 (1983); *Caldwell v. Blum,* 621 F.2d 491, 496–97 (2d Cir.1980), *cert. denied,* 452 U.S. 909, 101 S.Ct. 3039, 69 L.Ed.2d 412 (1981); *Friedman v. Berger,* 547 F.2d 724, 728–29 (2d Cir.1976), *cert. denied,* 430 U.S. 984, 97 S.Ct. 1681, 52 L.Ed.2d 378 (1977); *Calkins v. Blum,* 511 F.Supp. 1073, 1090–92 (N.D.N.Y.1981) *aff'd,* 675 F.2d 44 (2d Cir.1982). *See also Beltran v. Myers,* 451 U.S. 625, 629, 101 S.Ct. 1961, 1964, 68 L.Ed.2d 495 (1981) (Stevens, J., with whom Brennan, White and Marshall, JJ., joined concurring) (approving *Caldwell's* holding that a transfer of assets rule that is more restrictive for the medically needy than for the categorically needy is invalid under federal law).

We need not, however, resolve this controversy. Equal treatment between the medically and categorically needy is expressly ordered with respect to some particulars by other subsections of 42 U.S.C. 1396a. *See Schweiker v. Hogan,* 457 U.S. at 573 n. 6, 102 S.Ct. at 2601 n. 6. *See, e.g., Greklek v. Toia,* 565 F.2d 1259, 1261 (2d Cir.1977) (per curiam), *cert. denied,* 436 U.S. 962, 98 S.Ct. 3081, 57 L.Ed.2d 1128 (1978) (equal treatment with respect to income disregards required by section 1902(a)(17)(B)); *Calkins v. Blum,* 511 F.Supp. at 1092 (same). More importantly, the Secretary has determined that, whatever the import of section 1902(a)(17), equal treatment *is* required by section 1902(a)(10)-(C)(i)(III). *Cf.* H.R.Rep. No. 97–208, 97th Cong., 1st Sess., p. 971 (1981), reprinted in 1981 U.S.Code Cong. & Ad.News 396, 1010, 1333 (noting that the original comparability language of section 1902(a)(10)(C)(i) "has been interpreted to mean identical treatment for eligibility criteria and scope of services within the medically needy program and between the categorically needy and the medically needy programs.") She has accordingly adopted regulations prohibiting the states from using eligibility requirements which are more restrictive for medically needy than for categorically needy. *See* 42 C.F.R. § 435.401 (1985).

> Whatever level of financial eligibility the State determines to be that which is applicable for the eligibility of the needy aged, for example, shall be comparable to that which the State sets to determine the eligibility for the needy blind and disabled; and must also have a comparability to the standards used to determine the eligibility of those who are to receive medical assistance as needy children and the parents or other relatives caring for them.
>
> 1965 U.S.Code Cong. & Ad.News 2018. The House Report contained similar language,
>
> Under the bill, if a State extends the program to those persons not receiving assistance under titles I, IV, X, XIV, and XVI, the determination of financial eligibility must be on a basis that is comparable as among the people who, except for their income and resources, would be recipients of money for maintenance under the other public assistance programs. Thus, the income and resources limi-

> tation for the aged must be comparable to that set for the disabled and blind and must also have a comparability for that set for families with children who, except for their income and resources, would be eligible for AFDC. The scope, amount, and duration of medical assistance available to each of these groups must be equal.
>
> 1965 House Report at 67.

**18.** The cited statements were made during the legislative debate over the Omnibus Budget Reconciliation Act of 1981 ("OBRA"), P.L. No. 97–35, 95 Stat. 357 *et seq* (1981), which amended section 1902(a)(10)(C)(i)(III). The quoted sentence was to be part of the Reconciliation Conference Committee Report but was inadvertently omitted. Thereafter, it was read into the record from the floor by each of the managers of the bill. See 127 Cong.Rec. S9218 (daily ed. August 3, 1981); *id.* at H5804 and H5813 (daily ed. July 31, 1981).

Notwithstanding, the Secretary insists that the comparability requirement is not violated by a six month spenddown period. In her view, comparability is required, both by the Social Security Act and by her regulations, as to those matters and procedures of the medically needy program that have a counterpart in the categorically needy program. Thus, for those of the medically needy that qualify for Medicaid solely on the basis of their income level, *see supra,* note 2; 42 C.F.R. § 435.831(b), the determination of their countable income must be based on a one month period, the same as for the categorically needy under the SSI and the AFDC programs. But because the spenddown of income on medical expenses is an extra step not found on the eligibility determination procedure for the categorically needy, the Secretary believes the state is not bound, at that stage, by the one month budget period of the SSI and AFDC programs.

We cannot say this position is unreasonable. While we are not unsympathetic to plaintiffs' plight, and do not overlook their argument that a one month period is mandated because "in the area of public assistance, budgeting methodologies actually amount to eligibility rules," *Calkins v. Blum,* 511 F.Supp. at 1093, we feel constrained to follow the Secretary's interpretation in light of the deference owed both to her regulations in this area, *see* note 12, *supra,* and to her interpretation, generally, of this highly abstruse Act.

The 1981 legislation upon which plaintiffs rely focuses solely on determining eligibility under the basic categorical programs. Thus, it says,

An individual's eligibility for a benefit under this subchapter [viz. under subchapter XVI of the Social Security Act,

relating to SSI benefits] for a month shall be determined on the basis of the individual's (and eligible spouse's, if any) income, resources, and other relevant characteristics in such month, ...

95 Stat. 865, *codified* at 42 U.S.C. § 1382(C)(1).[19] There is nothing in the legislative history behind this provision to suggest an intention by Congress to override the Secretary's practice, in effect since 1966, of allowing a six month spenddown period for determining medically needy status. *See* S.Rep. No. 97–139, 97th Cong., 1st Sess., p. 524 (1981); H.R.Rep. No. 97–208, 97th Cong., 1st Sess., p. 987 (1981), *both reprinted in* 1981 U.S.Code Cong. & Ad.News at 790–91 and 1349, *respectively.*[20] Indeed, as we discuss later, the House committee reporting on the subsequent 1982 amendments to the OBRA specifically reaffirmed the Secretary's "financial eligibility requirements previously in effect for the medically needy", citing to the very regulations here challenged. At the time that the one month budget period was adopted for SSI, the majority of the states granting benefits to the medically needy were using a spenddown period in excess of one month. Had Congress meant to invalidate all these state programs plus the Secretary's longstanding regulation, it hardly would have done so through the indirect method of an amendment to the SSI and AFDC requirements alone, without any reference whatever to the medically needy.

At very least, we consider the comparability language in section 1902(a)(17) to be "not unambiguous". *Caldwell v. Blum,* 621 F.2d at 495 (remarking on similar language originally contained in section 1902(a)(10)(C)(i) ). Given the explicit authority granted to the Secretary in the

---

**19.** The corresponding provision for the AFDC program provides,

> The State agency ... will determine a family's eligibility for aid for a month on the basis of the family's income, composition, resources and other similar relevant circumstances during such month, ...

95 Stat. 855 (1981) *codified at* 42 U.S.C. § 602(a)(13)(A).

**20.** Prior to the OBRA, states were required to calculate SSI eligibility on a quarterly basis, *see* Pub.L. No. 92–603, 86 Stat. 1466 (1972). As defendants point out in their brief, this means that under plaintiffs theory, states using a one month spenddown period at that time—as allowed by the Secretary's regulation—would have been violating section 1902(a)(17).

same section over the extent to which costs incurred for medical care are to be taken into account, strongly-rooted principles of law require us to defer to the Secretary's interpretation, *see Herweg v. Ray,* 455 U.S. at 275, 102 S.Ct. at 1066; *Schweiker v. Gray Panthers,* 453 U.S. at 44, 101 S.Ct. at 2640; *Batterton v. Francis,* 432 U.S. at 426, 97 S.Ct. at 2406. This is not to say that another interpretation of the statute might not also be reasonable, *see Connecticut Department of Income Maintenance v. Heckler,* —— U.S. at ——, 105 S.Ct. at 2214; *cf. Commonwealth of Massachusetts v. Secretary of Health and Human Services,* 749 F.2d 89 (1st Cir.1984). But given the statutory language and legislative history we see no basis for holding that the Secretary's position is any the less reasonable. It follows that her regulation must stand.

Our view of this matter is strengthened by the Supreme Court's indication that the comparability language of section 1902(a)(17) does not require totally identical treatment between medically and categorically needy. The Court observed,

> In both § 1902(a)(10)[21] and § 1902(a)(17), see 79 Stat. 345–346, Congress required comparability among the various "categories" for which federal assistance was available, but these provisions did not require that the medically needy be treated comparably to the categorically needy in all respects.

**21.** This section has now been amended, substituting the comparability language for the requirement that "the same methodology" be employed to determine eligibility for categorically and medically needy. *See* text, Part IV, *infra.*

**22.** The Secretary's regulation does not violate Congress' interdiction against requiring an applicant to disburse a sum that would leave him below the applicable standard of need. Although, to be sure, the applicant must undergo the hardships of having to wait until he accumulates enough medical expenses to offset six month's worth of income, in the end, when he finally achieves eligibility, he has not been required to pay out more than his excess income for that period. As already pointed out, the 1965 House Report suggests that a budget period of up to a year might be used for this determination. *See* text, *supra.*

*Schweiker v. Hogan,* 457 U.S. at 587, 102 S.Ct. at 2608. *Cf.* H.R.Rep. No. 98–861, 98th Cong., 2d Sess. 1367 (1984), *reprinted in* 1984 U.S.Code Cong. & Ad.News 697, 2055 (disapproving the Secretary's position that "aged, blind, and disabled medically needy applicants who enter nursing homes and who have marginally excess resources on the first day of the month cannot attain Medicaid eligibility during the month, even after their resources are sufficiently depleted by medical costs, because SSI rules only allow eligibility from the first of the month.")

■ The use of a longer period for computing the spenddown of a non-institutionalized medically needy applicant than the one used for computing his income rests on the assumption that medical expenses occur for these applicants in a more irregular manner than income. This assumption lies within the Secretary's expertise in this area and within her authority to prescribe the extent to which medical expenses are to be taken into account.[22]

With respect to plaintiffs' claim that they should be allowed to anticipate future medical expenses to offset the burden of a six month spenddown, the case of *Williams v. St. Clair,* 610 F.2d 1244 (5th Cir. 1980) is instructive. That case involved a challenge to Mississippi's Medicaid program for the categorically needy. Mississippi is a so-called "section 209(b) option" state,[23] so that some of its SSI categorical-

**23.** When the federal government took over the SSI program in 1972, *see* note 1, *supra,* the new federal standards had the effect of expanding Medicaid coverage far beyond pre-1972 levels. The states were therefore given the alternative of operating under the "§ 209(b) option", providing automatic SSI assistance only to those individuals who would have been eligible under the state Medicaid plan in effect on January 1, 1972. Individuals ineligible at that time but eligible under the new federal standards were given the opportunity to qualify by spending down their income on medical expenses to reach the pre-1972 income eligibility levels. *See generally Schweiker v. Gray Panthers,* 453 U.S. at 37–39, 101 S.Ct. at 2636–2638. Massachusetts did not elect the § 209(b) option.

ly needy (those who would have been ineligible before the federal government took over the administration of SSI in 1972) are forced into a spenddown of their excess income on medical expenses similar to the one contemplated by section 1902(a)(17) for medically needy, *see* 42 U.S.C. § 1396a(f): Following the Secretary's regulations, Mississippi had adopted a six month spenddown period. Plaintiffs were a class of non-institutionalized categorically needy applicants subject to the section 209(b) spenddown who challenged, as plaintiffs do here, the state's failure to allow them to anticipate future medical expenses. The court said,

> [W]hile Congress has indicated states must consider medical expenses before denying eligibility, Congress has not explicitly addressed the manner in which states may do so. Congress has not, for example, required that states take into account anticipated expenses. It has said only that they must consider incurred expenses. We see no reason to require the state and HEW to give "incurred" a definition beyond its ordinary usage.
>
> Because of the congressional emphasis on flexibility, the states and HEW may adopt more liberal definitions if they wish, but they are not statutorily required to do so. HEW, recognizing the predictability and reliability of medical expenses of institutionalized persons, has allowed a more liberal definition in the case of institutionalized applicants. This it may do. On the other hand, because of the possibility of fraud, abuse, and unreliability, HEW has insisted upon the usual definition of incurred for those who are not institutionalized. This it may also do.

*Williams*, 610 F.2d at 1248. The court went on to uphold the challenged procedure based on the deference owed by the courts to the agency entrusted with the administration of an Act. *Id.* at 1249. *See also Poulos v. D'Elia*, 66 A.D.2d 820, 411 N.Y. S.2d 350 (1978) (Regulation of the Department of Social Services of the State of New York providing for the consideration, as an available resource, of six months of excess income if the applicant required in-patient care but only excess income for the month in which services were provided if the applicant utilized out-patient care, is not irrational under the Fourteenth Amendment).

We find this reasoning persuasive here.[24] While the district court relied on other decisions by federal district and state courts invalidating the six month spenddown period, *see Coleman v. Miller*, No. 82–C–6259 (N.D.Ill. Feb. 23, 1984); *Brogan v. Miller*, 537 F.Supp. 139 (N.D.Ill.1982); *Rivera v. Atkins*, No. 83–684 (Mass.Sup.Ct. March 26, 1984) *aff'd*, 395 Mass. 189, 479 N.E.2d 639 (1985); *see also Allen v. Petit*, No. 85–0025P (D.Me. June 3, 1985); *De Jesus v. Perales*, No. 84–1479T (W.D.N.Y., December 5, 1984), these give insufficient weight to the Secretary's construction of the Act and to her original regulation which has not been disturbed by Congress, *see Connecticut Department of Income Maintenance v. Heckler*, —— U.S. at ——, 105 S.Ct. at 2214; *United States v. Rutherford*, 442 U.S. 544, 554, 99 S.Ct. 2470, 2476, 61 L.Ed.2d 68 (1979)—indeed, which was expressly approved in a 1982 House report, *see infra*. The other cases relied on by the district court, while requiring equal treatment between medically and categorically needy with regard to some particulars, have done so relying to a greater or lesser extent on the Secretary's regulations, *see Beltran v. Myers*, 701 F.2d 91 (transfer of assets rule); *Caldwell v. Blum*, 621 F.2d 491 (same); *Fabula v. Buck*, 598 F.2d 869 (4th Cir.1979) (same); *Greklek v. Toia*, 565 F.2d 1259 (work-related expenses); *Calkins v. Blum*, 511 F.Supp. 1073 (income disregards). None of them has contradicted her interpretation of the Act, as plaintiffs wish us to do here. *See Caldwell*, 621 F.2d at 497 ("Considerable deference must be given to the reasonable interpretation of a statute by an agency entrusted with its administration ...").

---

**24.** We note that section 1902(a)(17) also requires that medical expenses be "incurred".

Defendants have explained that the six month spenddown period responds to the purpose of insuring that the limited resources of the Medicaid program go to those persons who are most needy. This is a "reasonable" justification under section 1902(a)(17). *See Williams v. St. Clair*, 610 F.2d at 1248. *See also* 1965 House Report at 66. ("[Categorically needy] people are the most needy in the country and it is appropriate for medical care costs to be met, first, for these people."); *Schweiker v. Hogan*, 457 U.S. at 590, 102 S.Ct. at 2610 ("It is rational to distribute public assistance benefits on the basis of the income and resources available to potential recipients.") We conclude that the Secretary's regulation permitting the states to adopt a spenddown period of up to six months is a valid and reasonable exercise of her delegated power and that this regulation and the state statute adopted pursuant to it, *see* 42 C.F.R. § 435.831 and Mass.Gen.Laws Ann. ch. 118E, § 10 are not inconsistent with 42 U.S.C. § 1396a(a)(17).

### IV. *"Same Methodology"*

Section 1902(a)(10)(C)(i)(III) provides that if a state plan contemplates assistance for the medically needy, then,

> the plan must include a description of (I) ..., (II) ..., (III) the single standard to be employed in determining income and resource eligibility for all such groups, and the methodology to be employed in determining such eligibility, which shall be the *same methodology* which would be employed under the supplemental security income program in the case of groups consisting of aged, blind, or disabled individuals in a state in which such program is in effect, and which shall be the *same methodology* which would be employed under the appropriate State plan ... to which such group is most closely categorically related in the case of other groups.

(Emphasis added) 42 U.S.C. § 1396a(a)(10)-(C)(i)(III).

In its opinion, the district court relied on the requirement contained in this section that the "same methodology" be used to determine eligibility for both categorically and medically needy. Defendants contend that the length of the spenddown period is not foreordained by this requirement (and by the fact that a one month budget period is required for categorically needy programs) because the spenddown concept has no counterpart in the eligibility determination procedure employed for the categorically needy. In their view, the district court erred when it equated the budget period used to determine an applicant's income (which is the same for all applicants in categorically needy and medically needy programs) with the budget period used to compute the spenddown of a medically needy applicant (which is a step particular to that program and therefore, inherently different in its methodology).

Defendants point out, moreover, that the term "methodology" as employed in this section was not meant by Congress to include the spenddown period. Until 1981, the text of section 1902(a)(10)(C)(i)(III) required the state to provide

> for making medical assistance available to all individuals who would, except for income and resources, be eligible for [AFDC or SSI] and who have insufficient (*as determined in accordance with comparable standards*) income and resources to meet the costs of necessary medical and remedial care and services
> ...

(Emphasis added) 42 U.S.C. § 1396a(a)(10) (C)(i) (1976).[25]

The comparability language contained in this version of the statute was similar to the one presently found in section 1902(a)(17) and was interpreted by the Secretary and by the courts to require a considerable degree of equal treatment be-

---

**25.** The original text, containing a slightly different wording, *see* 79 Stat. 345 (1965), was codified at 42 U.S.C. § 1396a(a)(10)(B)(i) (Supp. 1965–1968). Thereafter, in 1973, the quoted version was adopted and moved to subsection 1396a(a)(10)(C)(i), *see* Pub.L. No. 93–233, § 13(a)(3), 87 Stat. 960 (1973).

tween categorically and medically needy, *see* 38 Fed.Reg. 32,216 (1974), *originally codified at* 45 C.F.R. 248.2, *presently at* 42 C.F.R. 435.401 (1985); *Caldwell v. Blum,* 621 F.2d at 495; *Greklek v. Toia,* 565 F.2d at 1261; *Fabula v. Buck,* 598 F.2d at 872–873; *Hodecker v. Blum,* 525 F.Supp. 867, 871 (N.D.N.Y.1981); *Calkins v. Blum,* 511 F.Supp. 1091.

However, in the OBRA, 95 Stat. 357 (1981) Congress amended this section, deleting the comparability language. The amended section required that

> the plan must include a description of (I) the criteria for determining eligibility of individuals in the group for such medical assistance and (II) the amount, duration, and scope of medical assistance made available to individuals in the group.

95 Stat. 807 (1981).

The purpose of the amendment was to "provide States' [sic] with flexibility in establishing eligibility criteria and scope of services within the medically needy program to address the needs of different population groups more appropriately." H.R.Rep. No. 97–208, 97th Cong., 1st sess. 971 (1981), *reprinted in* 1981 U.S.Code Cong. & Ad.News 396, 1333. However, in her regulations adopted in response to this amendment the Secretary went beyond this goal, taking the position that

> States are no longer required to apply a uniform methodology for treating income and resources *in such matters as*

---

**26.** The Secretary added the following explanation:

> Before the 1981 Amendments, the methodology for the medically needy depended on the individuals' relationship to a specific cash assistance program. For example, the methodology for deeming the income of medically needy aged, blind, and disabled was taken from the SSI program. This was based on the former wording of section 1902(a)(10) for the Act that described the medically needy, in part, as individuals who "except for income and resources" would be eligible for cash assistance and for Medicaid as categorically needy. Furthermore, section 1902(a)(17)(C) of the Act required that the methodology for the treatment of income and resources be reasonable and gave the Secretary authority to prescribe standards regarding that methodology.

*deemed income, interest, court-ordered support payments, and infrequent and irregular income.* Rather the state plan must specify the methodology that will be used; and that methodology must be reasonable.

(Emphasis added) 46 Fed.Reg. 47,980 (1981).[26] Regulations were adopted covering the indicated matters. *See id.*

Thereafter, in the Tax Equity and Fiscal Responsibility Act of 1982 ("TEFRA"), Pub.L. No. 97–248, 96 Stat. 324 (1982), Congress sought to correct the Secretary's interpretation, amending section 1902(a)(10)(C)(i) again to introduce the "same methodology" language and rewording the statute in its present form in order to make clear the scope and intent of its OBRA amendments. These new changes were described as "[c]orrections reflecting technical errors in medicaid related provisions of the [OBRA]". *See* H.R. No. 97–757, Pt. I, 97th Cong., 2d Sess. 12 (1982). The House Report explained the purpose of the amendments.

> [T]he Committee bill clarifies the treatment of income and resource standards and methodologies for the medically needy. The 1981 Reconciliation Act gave the States certain specified flexibility in designing their medically needy programs. They are no longer required to cover all eligibility groups, e.g., aged, blind, or disabled persons and families

> ... [T]he 1981 Amendments revised the Medicaid state so that the direct linkage between the cash assistance programs and the medically needy is no longer explicit. (The statute no longer defines the medically needy as those who would be categorically needy "except for income and resources") Therefore, we have concluded that the State need not adopt the methodology of a related cash assistance program in treating income and resources of the medically needy. Rather, the State may develop its own. However, section 1902(a)(17)(C) of the Act has not been amended. Consequently, these final regulations require that the State must use a methodology for the treatment of income and resources that is reasonable.

46 Fed.Reg. 47,980 (1981).

with dependent children. They are no longer required to provide the same benefit package to each group they choose to cover. However, the 1981 Reconciliation Act made no changes in the applicable income and rerource eligibility rules.

Unfortunately, the Department, in its interim final rule of September 30, 1981, 46 Fed.Reg. 47976, assumed that the conferees had intended to give the States extensive flexibility in this area as well. This is simply incorrect. When the Statement of Managers of the conference committee report spoke of providing the States "with flexibility in establishing eligibility criteria and scope of services within the medically needy program to address the needs of different population groups more appropriately," (H.R.Rep. 97–208, p. 971), it was referring to the service package and coverage group provisions, not inviting a wholesale rewriting of current income and resource standards and methodologies. This amendment makes clear that the Department had no authority to alter the rules that applied before September 30, 1981, with respect to medically needy income levels, medically needy resource standards, and the methodology for treating medically needy income and resources. *The Committee bill reaffirms the financial requirements previously in effect for the medically needy (42 C.F.R. sec. 435.800–435.845).*

(Emphasis added). *Id* at 13. *See also* H.R. Rep. No. 98–861, 98th Cong., 2d Sess. 1366–67 (1984) *reprinted in* 1984 U.S.Code Cong. & Ad.News 697, 2054–55. ("No change was made or intended [by OBRA] with regard to financial eligibility policy ... [TEFRA] amended the Medicaid statute to clarify that Congress did not intend to change the policies governing the income and resource standards and methodologies for determining eligibility of the medically needy from those in effect before OBRA").[27]

This explanation of the amendment introducing the "same methodology" language to section 1902(a)(10)(C)(i)(III) is significant in various respects. First, it is evident that all that Congress meant to do was to correct the regulations adopted by the Secretary after the OBRA. This implies that the term "methodology" was employed by Congress in the same sense as the Secretary did in her regulations, *see supra,* note 21, a sense which did not contemplate the length of the spenddown period. Second, *the quoted Report specifically "affirm[ed] the financial requirements" previously contained in 42 C.F.R. §§ 435.800–435.845. This included the regulation challenged in this action allowing a six month spenddown period, 42 C.F.R. § 435.831.* As we have pointed out, it was precisely in the OBRA that Congress adopted a one month period for SSI and AFDC eligibility determinations, *see* 95 Stat. 855 and 865 (1981). It is hard to imagine a clearer indication that Congress *did not* intend to equate the length of the spenddown period with the length of the budget period used to determine income.

Plaintiffs claim that we should overlook the above-quoted expressions, relying on our decision in *Mayburg v. Secretary of H.H.S.,* 740 F.2d 100 (1st Cir.1984) to argue that Congressional inaction with regard to an interpretation adopted by the Secretary should not be read as an endorsement of her regulations. That case, however, is inapposite. There we disagreed with an allegation that the concious failure of Congress to amend a regulation when it had

---

**27.** After the TEFRA amendments, the Secretary took a strict position, interpreting literally the "same methodology" language to require identical treatment for medically and categorically needy even in those areas where the old, pre-OBRA standards and methodologies had been less restrictive for the medically needy than for the categorically needy. Consequently, in the Deficit Reduction Act of 1984, Pub.L. No. 98–369, 98 Stat. 1112 (1984), Congress adopted a moratorium on the Secretary's imposition of sanctions on states employing less restrictive methodologies for the medically needy. *See* H.R.Rep. No. 98–861, 98th Cong., 2d Sess. 1368 (1984) 1984 U.S.Code Cong. & Ad.News at 697, 2056. ("States may use less restrictive standards and methodologies in their non-cash programs, although they are still foreclosed from being more restrictive than the relevant cash assistance program").

the opportunity to do so should be taken to signify that Congress agreed that the Secretary's interpretation was correct. *Id.* at 104–105. Here, by contrast, Congress not only acquiesced in the Secretary's construction of the Act, but expressly approved of her regulations, including the one now challenged. We decline to assume, as plaintiffs urge us to, that the House committee did not know what it cited to in its report.

■ As noted above, section 1902(a)(17) is the section specifically dealing with the spenddown of medically needy, *see Clifford F. MacEvoy v. United States*, 322 U.S. 102, 107, 64 S.Ct. 890, 893, 88 L.Ed. 1163 (1944). This section gives the Secretary a broad authority to prescribe the way in which medical expenses will be taken into account for the eligibility determination of medically needy, and courts will normally defer to her regulations. Pursuant to this delegation, the Secretary has required identical treatment between categorically and medically needy in those areas of the eligibility determination procedure that are equivalent for the two programs, but (on the theory that the spenddown procedures are unique to the medically needy program) has allowed states to adopt spenddown periods of up to six months for medically needy. This position is supported by rational reasons of policy. The burden is therefore on plaintiffs to show that the Secretary's regulation is invalidated by section 1902(a)(10)(C)(i)(III) or some other section of the Social Security Act. Unlike the district court, we think that the plaintiffs have failed to carry this burden, in light of the legislative history reviewed above.

*The order of the district court in respect to the above matter is reversed.*