# United States Court of Appeals
## For the First Circuit

Nos. 11-1121, 11-1126, 11-1733

CONSEJO DE SALUD DE LA COMUNIDAD DE LA PLAYA DE PONCE, INC.,
CDT, d/b/a Centro de Diagnóstico y Tratamiento de la Playa de
Ponce; DR. JOSÉ S. BELAVAL, INC.; CONCILIO DE SALUD INTEGRAL
DE LOÍZA, INC. (CSILO); ATLANTIC MEDICAL CENTER, INC.;
CAMUY HEALTH SERVICES, INC.; CENTRO DE SALUD FAMILIAR
DR. JULIO PALMIERI FERRI, INC.; CIALES PRIMARY HEALTH CARE
SERVICES, INC.; CORPORACIÓN DE SERVICIOS MÉDICOS PRIMARIOS Y
PREVENCIÓN DE HATILLO, INC.; CORPORACIÓN DE SERVICIOS
INTEGRALES DE SALUD INTEGRAL DE LA MONTAÑA, INC.; CORPORACIÓN
DE SERVICIOS DE SALUD Y MEDICINA AVANZADA, INC.; EL CENTRO
DE SALUD DE LARES, INC.; EL CENTRO DE SERVICIOS PRIMARIOS
DE SALUD DE PATILLAS, INC.; MIGRANT HEALTH CENTER, INC.;
HOSPITAL GENERAL CASTAÑER, INC.; MOROVIS COMMUNITY HEALTH
CENTER, INC.; RINCÓN HEALTH CENTER, INC.;
GURABO COMMUNITY HEALTH CENTER, INC.,

Plaintiffs-Appellees, Cross-Appellants,

TOA ALTA COMPREHENSIVE URBAN/RURAL ADVANCED HEALTH
SERVICES, INC.; RÍO GRANDE COMMUNITY HEALTH CENTER, INC.,

Plaintiffs,

v.

LORENZO GONZÁLEZ-FELICIANO, Substituted for
Rosa Pérez-Perdomo, former Secretary, Department of Health,
Commonwealth of Puerto Rico,

Defendant-Appellant, Cross-Appellee,

COMMONWEALTH OF PUERTO RICO; DEPARTMENT OF HEALTH,
COMMONWEALTH OF PUERTO RICO; MICHAEL O. LEAVITT, Secretary of
the U.S. Department of Health; U.S. DEPARTMENT OF
HEALTH & HUMAN SERVICES,

Defendants.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Gustavo A. Gelpí, <u>U.S. District Judge</u>]

<hr />

Before

Torruella, Selya, and Lipez,
<u>Circuit Judges</u>.

<hr />

<u>Caroline M. Brown</u>, with whom <u>Matthew J. Berns</u>, <u>Covington & Burling LLP</u>, <u>Eliezer Aldarondo-Ortiz</u>, <u>Eliezer Aldarondo-López</u>, <u>Marla Hadad-Orta</u>, and <u>Aldarondo & López-Bras</u> was on brief, for appellant/cross-appellee.
<u>Robert A. Graham</u>, with whom <u>James L. Feldesman</u>, <u>Nicole M. Bacon</u>, and <u>Feldesman Tucker Leifer Fidell LLP</u> was on brief, for appellees/cross-appellants.

<hr />

August 20, 2012

<hr />

**TORRUELLA**, <u>Circuit Judge</u>.  We press on down the long and tedious road of litigation concerning the implementation of a federally-assisted Medicaid program by the Commonwealth of Puerto Rico (the "Commonwealth"), represented here by its Secretary of Health, Lorenzo González-Feliciano (the "Secretary").  In fact, these appeals mark the sixth time we have considered issues that are related to a dispute between the Commonwealth and several "federally qualified health centers" ("FQHCs").[1]  Plaintiffs-Appellees are FQHCs serving medically underserved populations in Puerto Rico.  They have taken their claims for reimbursement payments owed to them under the Medicaid program ("Medicaid" or the "Program"), 42 U.S.C. §§ 1396 <u>et seq.</u>, to the federal courts.  Consejo de Salud de la Comunidad de la Playa de Ponce ("Consejo"), has, since February 2009, represented nineteen such FQHCs (collectively, the "plaintiff FQHCs" or "plaintiffs"), acting in the capacity of lead Plaintiff-Appellee.

As the litigation now comes to us, the Secretary presents two main issues on appeal.  The first is whether the formula that

---

[1]  All FQHCs are health centers, but not all health centers are FQHCs.  Under 42 U.S.C. § 254b(a)(1), "the term 'health center' means an entity that serves a population that is medically underserved, or a specially medically underserved population comprised of migratory and seasonal agricultural workers, the homeless, and residents of public housing, by providing" certain statutorily-defined services.  The FQHCs involved in this litigation are eligible to receive Medicaid financial grants because they "serve[] a population that is medically underserved." <u>Id.</u>

-3-

the district court set in place by way of a preliminary injunction to calculate payments that the Commonwealth owes the FQHCs for providing Medicaid services mistakenly factored costs associated with beneficiaries whose care has been or should be paid solely through Commonwealth funds, thus resulting in overpayment to the plaintiff FQHCs. The second is whether the district court's formula also erroneously included certain third party costs for which the plaintiffs can already expect compensation through other means.

The plaintiff FQHCs cross-appeal and raise two claims. First, they contend that the district court's preliminary injunction improperly denied them indemnification from debts owed to third party managed care organizations. Second, the plaintiffs challenge the district court's judgment that the Eleventh Amendment bars a federal court from ordering the Commonwealth to reimburse the FQHCs for costs incurred prior to the date of its preliminary injunction.

After careful consideration of the parties' claims and arguments, we conclude that the formula that the district court endorsed in its preliminary injunction is not sufficiently supported by the factual record. Accordingly, we remand to the district court for further consideration and reformulation. With regards to the claims raised by the plaintiff FQHCs on their cross-appeal, we find that the issue of indemnification is not properly

within the scope of this litigation and affirm the district court's holding on that issue. Finally, we also affirm the district court's determination that the Eleventh Amendment precludes a federal court from imposing a judgment for money damages upon the Commonwealth to make payments for periods predating the date of the district court's preliminary injunction.

## I. **Background and Procedural History**

We have laid out much of the background relevant to these appeals in our past decisions in this protracted litigation.[2] We recount only the facts that are essential to the present appeals and refer to our prior judgments wherever those prove helpful to our exposition. We provide additional background relevant to each of the discrete issues before us infra.

---

[2] As explained further infra, these appeals are the first involving all of four separate but factually and legally similar cases that have now been consolidated into one. Before the district court consolidated these cases, this court considered three separate appeals in which Dr. José S. Belaval, Inc. ("Belaval"), an FQHC, appeared as lead plaintiff. Belaval has been party to all five previous appeals and again appears before this court, now represented by Consejo. For ease of reading, we refer to our previous judgments in this continuing litigation as Belaval I through Belaval V. Specifically, see Concilio de Salud Integral de Loíza, Inc. v. Pérez-Perdomo, 625 F.3d 15 (1st Cir. 2010) ("Belaval V"); Concilio de Salud Integral de Loíza, Inc. v. Pérez-Perdomo, 551 F.3d 10 (1st Cir. 2008) ("Belaval IV"); Dr. José S. Belaval, Inc. v. Pérez-Perdomo, 488 F.3d 11 (1st Cir. 2007) ("Belaval III"); Dr. José S. Belaval, Inc. v. Pérez-Perdomo, 465 F.3d 33 (1st Cir. 2006) ("Belaval II"); and Río Grande Cmty. Health Ctr., Inc. v. Rullán, 397 F.3d 56 (1st Cir. 2005) ("Belaval I").

## A. The Medicaid Framework

Medicaid is funded jointly through federal and state funds. See, e.g., 42 U.S.C. § 1301(a)(8)(A)-(B); see also Rabin v. Wilson-Coker, 362 F.3d 190, 192 (2d Cir. 2004). States are not obligated to participate in Medicaid, but must rigidly comply with several federally-imposed requirements if they opt to do so.[3] See Belaval I, 397 F.3d at 61. Importantly, participating states must offer certain "federally-qualified health center services," 42 U.S.C. §§ 1396a(a)(10)(A), 1396d(a)(2)(C), which may only be provided by FQHCs such as the consolidated plaintiffs in this litigation.

Under the Program, FQHCs are entitled to reimbursement for services they provide to Medicaid patients. 42 U.S.C. § 1396a(bb)(1). Reimbursement payments owed by a participating State to FQHCs are assessed through statutorily-set calculations established by Medicaid's Prospective Payment System ("PPS"). Most simply stated, "[u]nder the PPS, the reimbursement for a given year is calculated by multiplying the number of visits by Medicaid patients to [an] FQHC in that year by the average cost per patient visit in fiscal years 1999 and 2000, adjusting to account for an FQHC's change in services and inflation." Belaval V, 625 F.3d at 17 (citing 42 U.S.C. § 1396a(bb)(3)).

---

[3] Puerto Rico is considered a "State" under the Medicaid regime. See 42 U.S.C. § 1301(a)(1).

As is its prerogative, the Commonwealth has opted to operate its Medicaid system by contracting with managed care organizations ("MCOs"),[4] which then provide health services to Program beneficiaries. The Commonwealth pays these MCOs a fixed monthly fee and the MCOs either profit or turn a loss depending on whether the costs of provided services are less or greater than the fixed fee they receive. See Belaval I, 397 F.3d at 62. However, since MCOs often do not own facilities, they must routinely subcontract with FQHCs to provide medical services. In practice, an MCO will commonly contract with an FQHC to provide certain services to Medicaid beneficiaries for a fixed per-patient price, or "assigned capitation," on a pre-determined schedule. This arrangement can lead to a problem that is at the heart of this litigation: at times, an MCO's contract with an FQHC will not cover the amount the FQHC is entitled to receive as determined by PPS calculations. When this happens, the Commonwealth is statutorily required to pay the FQHC a supplemental "wraparound" payment at least three times a year to cover the difference between what an MCO paid the FQHC and what the FQHC is entitled to receive under the PPS regime. See 42 U.S.C. § 1396a(bb)(5)(A)-(B); see also Belaval IV, 551 F.3d at 12 (explaining "detailed scheme for calculating [] wraparound payments"). The upshot of this scheme is

_____

[4]   "MCOs are also commonly referred to as health maintenance organizations -- or HMOs." Belaval IV, 551 F.3d at 11.

that an FQHC operating in Puerto Rico often should receive two distinct payments for the services it provides Medicaid beneficiaries -- a direct payment from the MCO and a wraparound payment from the Commonwealth to supplement the former if it does not meet the amount that the FQHC is entitled to receive.

**B. The Road Here: Delayed Compliance and Litigation**

As events actually transpired, the Commonwealth dragged its feet in setting up an administrative system in order to comply with the PPS regime -- which was supposed to come into effect on January 1, 2001 -- and made no wraparound payments to FQHCs at all in 2001.  Despite some preliminary steps taken by the Commonwealth to adopt the PPS methodology, three FQHCs -- Appellees Concilio de Salud Integral de Loíza, Inc. ("Loíza"), Belaval, and Río Grande Community Health Center, Inc. ("Río Grande") -- filed suit in 2003 in the U.S. District Court for the District of Puerto Rico claiming that the Secretary had failed to release wraparound payments to which they were entitled to under the Program.  On March 31, 2004, the district court granted a motion, filed only by Loíza, which sought a temporary restraining order for emergency payments owed for the first quarter of 2004 on account of the "precarious financial position" that Loíza allegedly faced at the time.  See Belaval I, 397 F.3d at 65.  In granting Loíza's request for emergency relief, the district court also postulated a formula for the Secretary to use in calculating those wraparound payments.  Our

judgment in Belaval I, issued on February 14, 2005, affirmed the district court's decision to enjoin the Secretary to make payments to Loíza. See id. at 56.

On November 1, 2004, the district court granted a preliminary injunction in favor of Loíza and its two co-plaintiff FQHCs requiring the Secretary to set in place a system through which to comply with the PPS framework and make owed payments. The district court's November 1, 2004 order incorporated the formula it had set out in its previous March 31, 2004 judgment in favor of Loíza and endorsed it as the proper way to assess future payments owed to Loíza, Belaval, and Río Grande.

In the spring of 2006, Consejo and two other groups of FQHCs involved in these appeals filed separate suits against the Secretary alleging similar claims to those being aired in the then-pending action brought by Loíza, Belaval, and Río Grande.[5] These cases proceeded along discrete tracks until the district court

---

[5]  One group was comprised of twelve individual FQHCs: Atlantic Medical Center, Inc., Camuy Health Services, Inc., Centro de Salud Familiar Dr. Julio Palmieri Ferri, Inc., Ciales Primary Health Care Services, Inc., Corporación de Servicios Médicos Primarios y Prevención de Hatillo, Inc., Corporación de Servicios de Salud y Medicina Avanzada, Inc., Corporación de Servicios Integrales de Salud Integral de la Montaña Inc., El Centro de Salud de Lares Inc., El Centro de Servicios Primarios de Salud de Patillas, Inc., Hospital General Castañer Inc., Morovis Community Health Center Inc., and Rincón Health Center, Inc.

The other group of plaintiffs consisted of three individual FQHCs: Gurabo Community Health Center, Inc., Migrant Health Center, Inc., and Toa Alta Comprehensive Urban/Rural Advanced Health Services, Inc.

consolidated them into the current action and made Consejo the lead plaintiff.

On March 27, 2007, the district court, acting sua sponte, lifted the injunction it had set in place on November 1, 2004 as to Loíza, citing mootness grounds and its understanding that the Commonwealth had come into compliance with Medicaid's reimbursement requirements. The district court explained that the Commonwealth had established an office, the task of which was to calculate wraparound payments owed to FQHCs and which had begun to process these payments in earnest. Consequently, the district court enjoined the Commonwealth to proceed with issuing wraparound payments based on the formula it had laid out in its March 31, 2004 temporary restraining order. The court issued a similar order relating to Belaval on July 3, 2007.

Both the Secretary and the FQHCs appealed the district court's March 2007 ruling to this court, claiming that it left crucial issues relating to the calculation of wraparound payments unresolved. On December 15, 2008, in Belaval IV, we reversed the district court's order vacating its preliminary injunction. See 551 F.3d at 17. Our decision explained that the district court had failed to "rule on whether the formula adopted by the [Commonwealth's] PPS Office was in compliance with the methodology provisions of § 1396a(bb) [and failed to] fully determine what constitutes compliance under these provisions." Id. Accordingly,

we held that the district court had "erred in refusing to consider and resolve these issues before vacating the preliminary injunction and dismissing" the litigation on mootness grounds. Id. Our judgment reinstated the district court's November 1, 2004 preliminary injunction, lifted the injunction ordering the Secretary to use the district court's formula to calculate payments because unresolved disputed issues remained, and remanded to the district court for proceedings consistent with our opinion. See id. at 18-19.

As proceedings below were again taking shape, Loíza and Belaval filed a motion to the district court, now requesting payment of reimbursements allegedly owed to them for Medicaid-related costs accrued during what has, in the lexicon of this drawn-out litigation, come to be known as the "gap period": i.e., the interval between the district court's decision to vacate its preliminary injunction -- made on March 27, 2007, and July 3, 2007, for Loíza and Belaval, respectively -- and our December 15, 2008 judgment in Belaval IV reversing those termination orders. The Secretary opposed this motion and, on May 12, 2009, the district court denied Loíza and Belaval's request for gap period reimbursements. See Consejo de Salud Playa Ponce v. Pérez-Perdomo, No. 3:06-cv-01260-GAG (D.P.R. May 12, 2009). Citing concerns rooted in the Eleventh Amendment's protective scope -- which precludes a federal court from ordering a State to pay monetary

relief for past violations of a federal statute absent consent by the State, waiver, or congressional abrogation, see Edelman v. Jordan, 415 U.S. 651, 677-78 (1974) -- the district court reasoned that "the Secretary was not under any court-imposed obligation to issue any wraparound payments" during the gap period.

Loíza and Belaval pursued an interlocutory challenge to the district court's ruling. See Belaval V, 625 F.3d at 18-19. In Belaval V, we agreed with Loíza and Belaval's claims that the Eleventh Amendment did not bar the district court from ordering the Commonwealth to reimburse the health centers for Medicaid-related costs incurred during the gap period. Our judgment, issued on October 27, 2010, reasoned that the Secretary remained under a court-imposed obligation to make wraparound payments throughout the gap period by virtue of the original November 1, 2004 injunction, notwithstanding our mandate in Belaval IV reversing the district court's vacatur of the same injunction. See id. at 20 ("From the issuance of the preliminary injunction onward, a district court order was on the books requiring the formula payment; the district court orders at issue in Belaval IV discontinued the preliminary injunction requiring payment while simultaneously substituting permanent ones requiring payment."). Once again, we remanded the matter to the district court with instructions to proceed in a manner consistent with our guidance.

Matters proceeded rapidly following Belaval V. On November 8, 2010, the district court issued an order and preliminary injunction directing the Commonwealth to issue prospective payments to the plaintiff FQHCs. This order excluded Loíza and Belaval, for which the district court had already issued injunctive relief, and -- as the district court clarified in a subsequent order issued on November 9, 2010 -- Consejo, which had obtained similar relief on November 13, 2009. Importantly, in issuing the November 8, 2010 order requiring the Commonwealth to issue payments as of that date, the district court rejected the FQHC Plaintiff-Appellees' contention and its own prior determination that the Secretary had waived Eleventh Amendment protections as early as 2006 by virtue of its conduct in the litigation.

Challenging certain aspects of the district court's formula for calculating wraparound payments owed, which we explain in further detail below, the Secretary timely appealed the district court's preliminary injunction order on January 5, 2011. The plaintiff FQHCs cross-appealed as to the district court's conclusions regarding the Commonwealth's Eleventh Amendment immunity and debt indemnification.

## II. <u>Discussion</u>

**A.    Appealed Issues Regarding Formula for Calculation of Reimbursements Owed under 42 U.S.C. § 1396a(bb)**

The Secretary does not challenge the district court's decision ordering the Commonwealth to reimburse the plaintiff FQHCs for future Medicaid-related costs.  Rather, he claims that the district court erred when it incorporated two separate components into the formula whereby those reimbursement payments are to be assessed.  First, the Secretary argues that the formula erroneously factors into its calculations non-Medicaid beneficiaries whose care is solely funded through State funds.  Second, the Secretary challenges the district court's inclusion of certain costs into the formula for which he claims the plaintiff FQHCs can properly expect to receive remuneration from third parties.  We address each of these arguments in turn.

### 1. GHIP Recipients Included in Reimbursement Calculations

#### a. The Commonwealth's Health Insurance Structure

Established in 1965, Congress structured Medicaid to be "a cooperative federal and state cost-sharing venture for the provision of basic medical services to eligible applicants . . . ." <u>Hogan</u> v. <u>Heckler</u>, 769 F.2d 886, 887 (1st Cir. 1985) (internal citations omitted). As stated, once a State chooses to participate in Medicaid, it must agree to satisfy certain federally-imposed conditions and requirements.  In accordance with this arrangement, a participating State must submit a "State plan" proposal for

approval from the U.S. Secretary of Health and Human Services before it is eligible to receive federal Medicaid funding. See 42 U.S.C. §§ 1396a(b), 1396b(a)(1), (i)(17); see also Concourse Rehab. & Nursing Ctr. Inc. v. DeBuono, 179 F.3d 38, 41 (2d Cir. 1999).

Among other things, a State plan must set forth the categories of beneficiaries that a State intends to cover through Medicaid funding. Coverage of certain "categorically needy" beneficiaries -- for example, individuals who benefit from federal assistance plans such as the Aid to Families with Dependent Children ("AFDC") program or Supplemental Security Income for the Aged, Blind, and Disabled ("SSI") -- is compulsory, see 42 U.S.C. § 1396a(a)(10)(A); Hogan, 769 F.2d at 888, but a State retains discretion to cover other categories of beneficiaries if it elects to do so. First, a State may classify certain groups of individuals as being "optionally categorically needy" under 42 U.S.C. § 1396a(a)(10)(A)(ii)(I)-(XXII). The Commonwealth has opted to cover a number of these groups -- e.g., individuals who are under the age of 21 and meet AFDC's income requirements. Second, a State may similarly opt to cover "medically needy" individuals who satisfy categorical requirements but whose earnings or other assets put them over the financial eligibility limit. 42 U.S.C. § 1396a(a)(10)(C). Such individuals are eligible for Medicaid coverage if they "spend down" any excess income by incurring medical costs, thereby coming down to Medicaid eligibility levels.

-15-

See Hogan, 769 F.2d at 889.  The Commonwealth covers a small number of these groups as well -- e.g., pregnant women and individuals under age 18 who, but for income and resources, would otherwise qualify as categorically needy.

As is the case with other Medicaid-participating jurisdictions, the Commonwealth also administers its own health insurance plan.  Under Puerto Rico's "Plan de Salud del Gobierno" (otherwise known in Spanish as "Reforma"), the Commonwealth services beneficiaries that it considers "medically indigent" but who do not satisfy criteria for Medicaid eligibility.  Certain individuals who are not considered "medically indigent" -- such as Puerto Rico Police officers and government employees -- are also included in Reforma coverage.  The services provided to these groups of individuals are paid solely from Commonwealth funds.

Important to our discussion, the Commonwealth has structured its health care system so that a single administrative entity manages the provision of both federally-matched Medicaid and Reforma services.  Specifically, the provisions codified at P.R. Laws Ann. tit. 24, §§ 7001, 7003-7004, create the Puerto Rico Health Insurance Administration, or "ASES" as it is known by its Spanish-language acronym, and task it with administering the Commonwealth's Government Health Insurance Program ("GHIP"), which provides medical services to four primary and discrete recipient populations.  First, the GHIP covers all Medicaid beneficiaries.

-16-

See P.R. Laws. Ann. tit. 24, §§ 7025, 7029(a).  Second, the GHIP covers individuals eligible for assistance under the federally-created but jointly-administered Children's Health Insurance Program ("CHIP").[6]  Third, the GHIP covers individuals deemed "medically indigent" under the Commonwealth's Reforma plan.  See id.  Fourth, the GHIP covers individuals, such as Puerto Rico Police officers, who do not meet eligibility criteria under Medicaid or Reforma, but for whom the Commonwealth has nonetheless extended Reforma coverage.  As noted above, the services provided to these third and fourth recipient groups are paid entirely out of funds drawn from the Commonwealth's fisc.

Whether this arrangement constitutes the most reasonable way to administer such a system is far beyond the province of this court to decide.  What is certain, however, is that this scheme -- which calls upon a single administrative body to oversee the care provided to approximately 1.5 million beneficiaries, some covered by joint federal-state Medicaid funding and some covered only by Commonwealth funds -- has muddled an already convoluted set of factual and legal issues and generated continuous controversy.

---

[6]  In 2009, Congress enacted and the President signed into law the Children's Health Insurance Program Reauthorization Act of 2009 (CHIPRA).  Pub. L. No. 111-3, 123 Stat. 8 (2009).  Among other things, CHIPRA renamed the "State Children's Health Insurance Program" ("SCHIP") to its current form, omitting the word "State" from the program's title.  For ease of reading, this opinion will uniformly refer to the program as "CHIP," even if that was not the program's title during much of the relevant time period.

Because only a portion of GHIP recipients are eligible for Medicaid-covered services, the parties have disputed whether the formula used to calculate wraparound payments has at times been underinclusive by leaving out costs incurred in providing care to certain Medicaid beneficiaries (in which case the plaintiffs would be short-changed of certain reimbursements owed to them) or overinclusive in factoring individuals who actually receive only Commonwealth-funded benefits (in which case the Commonwealth would overpay the plaintiff FQHCs reimbursement for costs they are not owed).

### b. Inclusion of "State/Other Medicaid" Modifier in Wraparound Payment Formula

Currently, the preliminary injunction uses a formula for calculating the wraparound payments owed to an FQHC under the PPS by adopting much of the methodology that one of the Commonwealth's auditors, Ramón L. Marrero Rosado ("Marrero"), first employed in 2003. See Belaval I, 397 F.3d at 63 (discussing Marrero methodology). Marrero began by identifying the total number of patients seen by an FQHC in 1999 and 2000, the PPS "base years." See id. He then multiplied the total number of patients by "the percentage of patients attended [] who are 'purely Medicaid.'" Id. Marrero then divided the costs that could be accredited to "purely Medicaid" beneficiaries by the number of "purely Medicaid" patients to determine the figure that the statute takes as the base for

wraparound payment calculations for each FQHC.  See  42 U.S.C. § 1396a(bb)(3).

Marrero arrived at the "purely Medicaid" multiplier by auditing ASES-created tables detailing the percentages of respective FQHCs that could be classified into four different categories of GHIP recipients: "'Pure' or 'Federal' Medicaid," "State/Other Medicaid," "CHIP," and "Other Reforma."  Prior to the district court's issuing an advance order on January 7, 2009, the formula only required the Commonwealth to reimburse FQHCs for costs accrued in servicing beneficiaries falling under the "Pure Medicaid" label.  In contrast, the current wraparound payment formula -- which was rendered binding by the district court's November 2010 injunction -- incorporates costs that the FQHCs incur in providing care to beneficiaries belonging to three of the four categories: "Pure Medicaid," "State/Other Medicaid," and "CHIP."

The Secretary does not challenge the inclusion of costs accrued in relation to CHIP beneficiaries into the formula.[7]

---

[7]  CHIPRA established a reimbursement scheme applicable to CHIP that is identical to Medicaid's.  See 42 U.S.C. § 1397gg(e)(1)(G) (adopting Medicaid's reimbursement scheme for services provided by FQHCs and rural health clinics by cross-reference to § 1396a(bb)).  Although the Secretary once argued before the district court that CHIP was a plan separate from Medicaid and that CHIP visits should not factor into Program reimbursement calculations, the Secretary now abides by the guidance of the Centers for Medicaid and State Operations ("CMS") which, in 2010, endorsed the view that CHIP programs were instead implemented as expansions to Medicaid.  See Letter from Cindy Mann, Director, CMS Center for Medicaid and State Operations, at 2 (Feb. 4, 2010), available at http://www.cms.gov/smdl/downloads/SHO10004.pdf. Consequently, the Secretary now concedes that CHIP visits should be included in wraparound payments made to the FQHCs.

-19-

Neither do the parties dispute that costs accrued in connection with recipients falling under the "Other Reforma" modifier -- such as Puerto Rico Police officers and government employees -- should be excluded from reimbursement calculations.  The Secretary also accepts the proposition that the Commonwealth must reimburse FQHCs for relevant services provided to all federally-matched beneficiaries, not just those that fall under Medicaid's mandatory "categorically needy" classification.

This last point is an important one.  The district court's advance ruling rested in large part on the court's apparent understanding that the Secretary's position below was a less nuanced postulation.  Specifically, the district court seemingly understood that the Commonwealth considered that its responsibility to reimburse FQHCs extended only to services provided to recipients that must be covered as "categorically needy" under the Medicaid statute.  See 42 U.S.C. § 1396a(a)(10)(A).  In its order modifying its own prior preliminary injunction, the district court concluded that certain "optional" groups, such as "foster care children," "individuals and families with up to 200% of the Puerto Rico poverty level," and "dual eligibles" -- i.e., recipients who qualify for both Medicaid and Medicare under 42 U.S.C. § 1396u-5(c)(6)(A) -- were eligible for Medicaid federal assistance under the Commonwealth's plan but, importantly, were not accounted for under the "Pure Medicaid" modifier.  Thus, the district court

-20-

appears to have reasoned that these optional groups fell under the "State/Other Medicaid" category and that the Commonwealth was responsible for reimbursing FQHCs for reasonable services provided to that entire population as well. See Amend. to Opinion and Order of June 4, 2008 Re: "Pure Medicaid" Modifier, Consejo de Salud v. Sec'y of Health, (Civil Nos. 06-1260 (GAG), 06-1542 (GAG) (Jan. 7, 2009)).

Even if that was indeed the Secretary's position at some point, it no longer is at this juncture. What the Secretary contests is the district court's inclusion of the "State/Other Medicaid" category, which accounts for approximately 22 percent of all GHIP recipients, into the formula the Commonwealth will follow in calculating wraparound payments owed to the FQHCs. This contention implicates the proper interpretation of § 1396a(bb) of the Medicaid statute, and we consider it de novo.[8] See Belaval IV, 551 F.3d at 16. We review the district court's findings of fact for clear error and show "considerable deference" to its judgment calls. New Comm Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir. 2002).

Simply stated, the Secretary's claim is that the "State/Other Medicaid" classification of GHIP recipients does not

---

[8] As noted, the Secretary does not challenge the district court's decision to grant preliminary injunctive relief in the plaintiff FQHCs' favor, a determination that we would normally review for abuse of discretion. Charlesbank Equity Fund II v. Blinds To Go, Inc., 370 F.3d 151, 158 (1st Cir. 2004).

implicate costs that FQHCs would incur in providing care specifically to Medicaid-eligible patients. Understandably, the federal Medicaid statute only requires the Commonwealth to reimburse the FQHCs for care provided to federally-matched Medicaid-eligible beneficiaries, not those that the Commonwealth has pledged to support with its own funds through Reforma. In this regard, Congress has anchored the scheme by which wraparound payments are to be calculated to the amount of visits made by Medicaid patients to a given FQHC in two "base" years, 1999 and 2000. See 42 U.S.C. § 1396a(bb)(2)-(3); see also Belaval IV, 551 F.3d at 12 (describing PPS calculations). The Secretary argues that recipients falling into the "State/Other Medicaid" label are Reforma-only beneficiaries and should not figure into this base calculation. To the extent that the relevant modifier refers to these patients as being "Other Medicaid" the label is a misnomer, or so the argument goes.

The issue presented appears to be potentially two-pronged. To suitably resolve the parties' controversy on this point, it seems proper to first ascertain whether certain disputed categories of recipients were covered by federal Medicaid assistance under the Commonwealth's State plan. Second, it would then be necessary to turn to the tables used to determine the FQHCs' base rates and assess whether those categories of persons

are in fact listed under the "State/Other Medicaid" modifier or instead belong to another category.

The Secretary points to evidence in the record which he claims suggests that the identified groups were not, in fact, stand-alone eligibility categories under the Commonwealth's State plan or instead were elements of larger categories already collapsed into the "Pure Medicaid" descriptor. Foster care children, for example, are not expressly referenced as a separate eligibility category in the Commonwealth's State plan. Similarly, the Secretary highlights evidence in the record that he claims to be contradictory of the plaintiff FQHCs' claim below (and the district court's reasoning) that "dual eligible" recipients fit squarely and solely into the "State/Other Medicaid" category. Most notably, population distribution tables that the plaintiffs entered into evidence place several thousand Medicare enrollees under columns listing "Federal Medicaid" or "Pure Medicaid" beneficiaries.

In briefing to this court, the plaintiff FQHCs counter that the district court's findings as to groups such as foster care children and dual eligibles belonging to the "State/Other Medicaid" category are supported by evidence in the record and are consistent with information that the Commonwealth has reported in the past to federal health agencies. The plaintiff FQHCs cite to the Commonwealth's profile in the 2005 National Summary of State

Medicaid Managed Care Programs, a CMS-prepared document detailing data culled from programs that employ MCOs to deliver health services. See Ctrs. for Medicare & Medicaid Servs., 2005 National Summary of State Medicaid Managed Care Programs, June 30, 2005, available at http://media.khi.org/news/documents/2011/12/05/Medicaid_managed_care_national_rpt_2005.pdf. Because this document lists the disputed recipient groupings along with other Medicaid beneficiaries, see id. at 461-62, the plaintiffs reason that the Commonwealth has all but conceded that these controverted populations are comprised of federally-matched Medicaid beneficiaries and argues that the Secretary cannot now claim otherwise.

The fact that controverted population groups -- such as foster care children and "dual eligibles" -- appear on a CMS listing alongside undisputed federally-matched populations appears, at first blush at least, to cut in the plaintiff FQHCs' favor. We are unconvinced, however, that the CMS 2005 National Summary document does much to resolve matters. As the Secretary correctly notes, the listing upon which the plaintiffs rely also enumerates Puerto Rico Police officers as a distinct population, but this recipient grouping is indisputably covered only by the Commonwealth's Reforma funds. Thus, insofar as the CMS summary document includes -- without differentiation -- both federally-assisted persons and those covered only by Commonwealth funds, it

-24-

adds nothing to the question of how to distinguish between these two groups. At best, the summary supplies further obfuscation where none is necessary.

The district court's advance order is unfortunately consonant with this confused state of affairs. Indeed, because the ruling lacks citation to competent record evidence or relevant law, it is unclear to us how the court reached the conclusion that the disputed GHIP recipient groupings were comprised of optional federally-matched Medicaid beneficiaries or, for that matter, that those groupings could be properly subsumed into the "State/Other Medicaid" collection of recipient populations. We are mindful that any concerns we may have in this regard touch upon the court's ability to reach factual determinations and balance the equities of a case, an area in which we commonly accord considerable deference to the district court's competence. See Waldron v. George Weston Bakeries, Inc., 570 F.3d 5, 8-9 (1st Cir. 2009). But "deference has its limits," Belaval IV, 551 F.3d at 16, and our cases are clear that a district court's decision to "grant or deny a preliminary injunction must be supported by adequate findings of fact and conclusions of law," TEC Eng'g Corp. v. Budget Molders Supply, Inc., 82 F.3d 542, 544-45 (1st Cir. 1996).

Here, we do not believe that the district court made sufficiently specific and clearly-stated findings of fact. In its three-page written order the district court concluded, without

more, that the three above-cited populations -- i.e., "foster care children," "individuals and families with incomes up to 200% of the Puerto Rico poverty level," and "so-called 'Medicare dual eligibles'" -- were comprised of non-CHIP optional federally-matched beneficiaries under the State plan. As we have noted, the Secretary proffers evidence which he claims is suggestive that this is not the case, but in any event, the district court's order did not communicate any specific findings as to whether those populations properly belonged in the much maligned "State/Other Medicaid" classification. In the compass of this convoluted litigation, we do not believe that the district court's reasoning supports its judgment modifying the wraparound payment formula to its current form.

Neither do we believe, however, that the record permits us to resolve the dispute regarding the size of the Commonwealth's federally-matched beneficiary population in favor of either side. The plaintiffs present evidence and arguments that muddy the waters and complicate the questions we are asked to consider, some of which were not raised below and which, as our cases command, this court will not consider for the first time on appeal. See Kozikowski v. Toll Bros., Inc., 354 F.3d 16, 23 (1st Cir. 2003). Unable to undertake informed review of the issues presented, we remand to the district court for additional factfinding and legal determinations. See, e.g., TEC Eng'g Corp., 82 F.3d at 545

-26-

(remanding to district court where court "unable to engage in meaningful appellate review"). On remand, the district court should engage in the two-pronged analysis we have outlined above, first ascertaining whether disputed GHIP recipient populations are comprised of federally-matched Medicaid beneficiaries under the Commonwealth's State plan, then locating whether these fall in the "State/Other Medicaid" classification or otherwise. The district court should also evaluate any as-yet unreviewed or unconsidered evidence that the Secretary filed in response to its advance ruling on the reimbursement formula.

### 2. Inclusion of Capitation Payments in Reimbursement Calculations

The second claim that the Secretary presents concerns the question of whether the Commonwealth can deduct certain funds that an MCO has paid an FQHC's third party subcontractors from its supplemental payment obligations.[9] This issue arises because FQHCs sometimes subcontract with third parties to provide Medicaid services and those third parties are then reimbursed directly by the MCO on a fee-for-service basis with funds from the FQHCs' assigned capitation. The Secretary alleges that these payments to third party subcontractors should count as payments to the FQHCs

---

[9] We note that our discussion of the MCO payment to third party subcontractor issue does not pertain to Consejo. The Secretary and Consejo have agreed that costs incurred by third party providers with whom Consejo has subcontracted should not figure into PPS calculations specific to that FQHC.

because, as a special master assigned to the case explained in proceedings below, the FQHCs commonly include these third party costs as expenditures in their own financial statements. Assigned capitation amounts that an MCO pays either directly to an FQHC or to an FQHC's third party creditor, the Secretary ultimately contends, should be deducted from the Commonwealth's wraparound obligations.

In essence, this issue concerns the proper interpretation of the Medicaid statute. The statutory provision requiring the Commonwealth to make the wraparound payments at issue in this litigation is codified at 42 U.S.C. § 1396a(bb)(5). In pertinent part, the statute provides:

> In the case of services furnished by a[n] [FQHC] pursuant to a contract between the center or clinic and a[n] [MCO], the State plan shall provide for payment to the center or clinic by the State of a supplemental payment equal to the amount (if any) by which the amount determined . . . exceeds the amount of the payments provided under the contract.

42 U.S.C. § 1396a(bb)(5)(A). The Secretary now appeals whether, in a June 4, 2008 ruling, the district court correctly concluded that MCO payments to third party service providers who have subcontracted with FQHCs properly constitute "payments provided under the contract" under § 1396a(bb)(5)(A).

The Secretary and the plaintiff FQHCs have consistently disputed § 1396a(bb)(5)(A)'s scope. Seizing upon the "payments provided under the contract" language, the Secretary first argued

-28-

that the Commonwealth could deduct the amount that an MCO owed an FQHC under the terms of the contract between them from wraparound calculations.  See Belaval IV, 551 F.3d at 13.  Conversely, as early as 2005, the plaintiff FQHCs involved in the original action stressed that the statute accounts for payments that an FQHC has actually received from an MCO, not those which are owed but which the MCO's had not yet disbursed in the center's favor.  If the Secretary could offset his wraparound obligations by deducting these "phantom MCO payments," the plaintiffs argued, the FQHCs could be left holding the bag as to certain funds owed to them if the MCOs defaulted on payment.  See id. (noting "[p]laintiffs argued before the district court that the payments actually made by MCOs often fall well short of the amounts budgeted by contract").  On October 6, 2005, the district court resolved this disagreement in the plaintiff FQHCs' favor, specifically ruling that "§ 1396a(bb)(5) barred the deduction of 'phantom MCO payments,'" id. at 14, and "interpret[ing] the phrase 'payments provided under the contract' to allow the deduction only of amounts actually paid by the MCO to the FQHC," id. (internal citation omitted) (quoting 42 U.S.C. § 1396a(bb)(5)(A)).

The Secretary concedes the district court's October 6, 2005 ruling, but posits that decision bore specifically on the narrower issue of contractual default on the part of an MCO and does not inform the separate question, presented here, of whether

-29-

payments made directly from an MCO to a third party should offset wraparound calculations. Put another way, the Secretary reasons that just because the sums an MCO pays a third party creditor never flow through an FQHC's coffers it does not follow that they are not "amounts actually paid by the MCO to the FQHC." Id. If they were not, the Secretary contends, the FQHCs would be doubly reimbursed for these costs -- once, when an MCO paid off their third party debt for services rendered, and a second time when the Commonwealth remitted the FQHC a wraparound payment for the same services.

The Secretary relies on a 2000 agency guidance letter to support his proposition that assigned capitation is the correct amount that the Commonwealth should be allowed to deduct from its wraparound calculations. See Letter from Timothy M. Westmoreland, Director of the Center for Medicaid and State Operations, HCFA, to State Medicaid Director (Sept. 27, 2000), available at https://www.cms.gov/smdl/downloads/smd092700.pdf (hereinafter, "CMS Letter"). The CMS Letter discusses possible negative or positive incentive structures in MCO-FQHC contractual relationships, specifically, the way in which "MCOs frequently use their own funds to include financial incentives in their contracts with subcontracting providers." Id. In relevant part, the letter states: "Inclusion of incentive amounts (whether positive or negative) in calculating supplemental payments would negate the financial impact [an] incentive is designed to provide. . . .

-30-

[Therefore], the State's quarterly supplemental payment obligation should be determined using the baseline payment under the contract for services being provided." Id. (emphasis added). Relying on the accentuated language the Secretary argues that, because the letter calls for a wraparound payment based on the amount contracted between an MCO and an FQHC, regardless of negative incentives, CMS has interpreted the Medicaid statute's reference to "the amount of the payments provided under the contract" to mean assigned capitation. Further, since the CMS Letter interprets § 1396a(bb)(5)(A)'s predecessor statute and Congress reenacted the wraparound provision without change when it set the PPS in place, the Secretary posits that Congress in essence ratified the agency's interpretation. See, e.g., Lorillard v. Pons, 434 U.S. 575, 580 (1978) ("Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change.").

The plaintiff FQHCs dismiss the CMS Letter's import, countering that the letter does not say what the Secretary says it does. More importantly, the plaintiff FQHCs highlight a distinction between what they term "FQHC services" and "non-FQHC services," which they claim the Secretary's entire argumentation overlooks. The plaintiff FQHCs contend that the current preliminary injunction formula correctly ensures that FQHCs are reimbursed for money paid by an MCO to a third party for non-FQHC

-31-

(i.e., non-primary) services -- e.g., "hospitalization, specialty care, [and] ancillary services unassociated with FQHC operations" -- while allowing the Commonwealth to deduct costs associated with "FQHC" or "primary" services that the FQHC provides. The plaintiff FQHCs posit that reference to "primary care" services in these documents clearly indicates that any payments from an MCO to a third party for so-called non-FQHC services should not count towards a reduction of their wraparound reimbursements.

Insofar as the parties ask us to resolve this dispute, we note that we are again presented with evidence and arguments which the parties have raised for the first time in briefing to this court. As we have already explained, "'[i]t is well established that this court will not consider an argument presented for the first time on appeal,'" Hidalgo v. Overseas Condado Ins. Agencies, Inc., 120 F.3d 328, 333 n.3 (1st Cir. 1997) (quoting Villafañe-Neriz v. F.D.I.C., 75 F.3d 727, 734 (1st Cir. 1996)), and we see no reason here to deviate from this well-settled rule. Although the district court cannot be faulted for failing to consider evidence that the parties did not bring before it, we also again find the court's ruling on this issue too sparse for comfort. Indeed, to the extent that the district court provided the reasoning behind its decision not to allow the Commonwealth to offset MCO payments to FQHCs' third party creditors from reimbursement obligations, the district court only noted that the Secretary's argument had been

-32-

"squarely rejected" by the court in its October 6, 2005 ruling regarding "phantom MCO payments." See Consejo de Salud Playa Ponce v. Gurabo Cmty. Health Ctr., Inc., No. 3:06-cv-01260-GAG (D.P.R. June 4, 2008). Here, we must agree with the crux of the Secretary's postulation: the two issues are dissimilar enough that one does not naturally follow from the other. That is to say, the fact that the Commonwealth must reimburse an FQHC for moneys owed but which an MCO never disbursed in the FQHC's favor does not answer the separate question of which FQHC costs should be altogether deducted from the Commonwealth's repayment obligations because the MCOs have covered them in the first place.[10]

The district court's silence on this distinction is all the more concerning in light of two of the findings that the special master assigned to this case made during the proceedings below. First, the special master determined that the FQHCs receive three different types of "payment" from MCOs, including direct fee-for-service reimbursement,[11] third party fee-for-service reimbursement, and capitation payments. Second, he notably

---

[10] The Secretary notes that the district court appears to have recognized this distinction during an evidentiary hearing in which the district judge noted that the court had addressed the third party payment issue previously but added: "I don't think it was raised in that case the same [] way it was raised here."

[11] Under a direct "fee-for-service" arrangement, the FQHC bills an MCO for provided services on a fee-for-service sub-capitated basis. The parties have agreed that payments made in this manner should be properly subtracted from the wraparound amount owed by the Commonwealth as payments already received directly from the MCO.

concluded that if payments to third parties are excluded from calculations of the wraparound amount due, those same costs must be excluded from PPS rates used to calculate the Commonwealth's reimbursement obligations. In its ruling, the district court did not present reasons as to why it did not find that the special master's factual conclusions informed the matter before it. We are cognizant of the considerable discretion that a district court retains regarding a special master's findings. See Ballard v. Comm'r, 544 U.S. 40, 66 (2005) (Kennedy, J., concurring) ("The court after hearing may adopt the special master's report or may modify it or may reject it in whole or in part or may receive further evidence or may recommit it with instructions." (quoting Fed. R. Civ. P. 53(e)(2))). But, as we have already noted, a district court's judgment to grant an injunction must be properly grounded in both fact and law. Here, we cannot conclude that that is the case. Accordingly -- and because we believe that the district court is better-situated to view the parties' arguments through the lens of this litigation's extensive record -- we again remand so that the district court may further consider whether MCO payments to third parties made on an FQHC's behalf can be deducted from the Commonwealth's PPS base rates. See Harlow v. Fitzgerald, 457 U.S. 800, 820 (1982) (remanding where "trial court is more familiar with the record so far developed and also [] better situated to make any such findings as may be necessary"). As

before, we instruct the district court, in resolving this issue, to review any as-yet unconsidered evidence or argumentation that the parties presented after its ruling.

## B. Indemnification of Plaintiff FQHCs' Debts to MCOs

We now address the issues that the plaintiff FQHCs raise on cross-appeal. The plaintiff FQHCs first contend that the district court improperly refused to either clarify or modify its preliminary injunction to afford them protection from debts accruing to MCOs. For the reasons we now outline, we agree with the district court that the issue of debt indemnification is not properly within the scope of this litigation and affirm the district court's ruling on this question.

We briefly frame the plaintiff FQHCs' debt indemnification claim. The plaintiff FQHCs' request for debt protection is grounded in their stated concern that Puerto Rico's managed care system improperly transfers financial risk from MCOs to primary care providers. As has been explained in some detail supra, the Puerto Rico Department of Health contracts with MCOs to provide health care services. In turn, MCOs enter into subcontracts with primary care providers, such as the plaintiff FQHCs, to arrange for delivery of these services. To the extent that the FQHCs' costs as determined by Medicaid's formula exceed payments provided to them under their contracts with the MCOs, the Commonwealth must then disburse a wraparound reimbursement to

-35-

ensure that FQHCs receive the amount to which they are entitled under the statute.

As with the previously discussed matter of MCO payments to an FQHC's third party creditors, the plaintiff FQHCs' debt indemnification claim arises in the context of MCO-FQHC contractual relations. Because third party health care providers are reimbursed for FQHCs' costs by MCOs with funds out of the FQHCs' assigned capitation, to the extent that third party costs <u>exceed</u> an FQHC's assigned capitation amount, such an FQHC effectively incurs a debt to an MCO. The plaintiff FQHCs argue that this arrangement impermissibly "downloads" financial risk onto the FQHCs, forcing them to "pay to play" -- <u>i.e.</u>, participate -- in the Commonwealth's Medicaid scheme. According to the plaintiff FQHCs, the resulting debt obligation to MCOs in this scenario yields a dollar-for-dollar reduction in the wraparound payment they would otherwise be entitled to under the Medicaid formula prescribed by the district court's preliminary injunction. Specifically, the plaintiffs contend that, insofar as the preliminary injunction interprets the statutory language "payments provided under the contract" to refer to net capitation -- <u>i.e.</u>, payments that the FQHCs have actually <u>received</u> under their contracts with MCOs -- the injunction does not account for situations in which FQHCs not only fail to receive any actual payments from MCOs, but also incur a debt with the MCOs.

Despite the general allegations in the FQHCs' complaints and other pleadings denouncing concerns over improper "risk downloading" in Puerto Rico's managed care system, the FQHCs did not specifically (or explicitly) request the district court for relief pertaining to this specific claim until December 2010. At that date, the plaintiff FQHCs asked the district court to amend its November 2010 preliminary injunction in order to "either (1) clarify its wraparound formula to state that the difference between plaintiffs' costs and payments actually received from an [MCO] must account for debt accrued to that [MCO] dollar for dollar, or (2) order [the Secretary] to indemnify and hold plaintiffs harmless against any [MCO] efforts to collect such debts."

The district court denied the motion on June 8, 2011. In response, the plaintiffs filed a notice of appeal and a motion for injunction pending appeal in which they restated their request to alter the preliminary injunction to afford them protection against debts accrued to MCOs. On June 30, 2011, the district court again denied the plaintiff FQHCs' request in a two-sentence order in which it declared that the motion "involves non-parties to this action and the relief sought is outside the scope of this litigation."

On cross-appeal, the plaintiffs charge that the district court abused its discretion when it refused to grant their request for debt indemnification. The plaintiff FQHCs point to allegations

-37-

in their complaints and other pleadings to support their claim that the question of how MCO debts should be properly addressed squarely falls within the scope of this case.

We find these arguments unavailing. The district court without a doubt enjoys considerable discretion in deciding whether or not to expand the scope of a case. See Donahue v. City of Boston, 371 F.3d 7, 17 (1st Cir. 2004); see also Harper v. Colo. State Bd. of Land Comm'rs, 248 F. App'x 4, 13 (10th Cir. 2007) (holding that the management of the scope of the issues in a case is committed to the district court's discretion). Here, a plain reading of the plaintiffs' varied complaints and other filings below confirms that the district court did not abuse its discretion when it concluded that the debt indemnification relief that the plaintiff FQHCs sought lies outside the scope of this long-running litigation. Specifically, three of the four underlying complaints in these consolidated appeals -- i.e., those filed by Atlantic Medical Center, Gurabo, and Río Grande -- sought to "enjoin [the Secretary] . . . from failing to pay federally-qualified health centers." Consistent with this request, the plaintiff FQHCs then proceeded to dissect the Medicaid statute's provisions regarding a State's obligations to issue wraparound payments under a managed care system. In a section titled "Violations of the Medicaid Statute," the FQHCs denounced the Commonwealth's failure "to pay, or assure payment to, FQHCs of the wraparound (or other payment) to

-38-

which those FQHCs have been and continue to be entitled" under the Medicaid statute. The fourth complaint, filed by Consejo, is similarly structured and limited itself to "seeking an order . . . directing defendant . . . to make future wraparound payments as they become due." From these pleadings, the plaintiff FQHCs' claims for relief appear limited to requesting injunctive relief that would ensure that the Commonwealth issued prospective wraparound payments under the Medicaid statute. As a result, the pleadings do not suggest that the district court abused its discretion in failing to accommodate the plaintiff FQHCs' final hour request for modification of its injunction.

The plaintiff FQHCs attempt to buttress their request for debt indemnification by claiming that any such request was properly grounded on their repeated denunciation of the alleged "full risk" feature of their contracts with MCOs -- a concern they expressed in pleadings and filings submitted to the district court. With one ineffectual exception,[12] however, the plaintiffs never drew an

---

[12] We note that plaintiffs Belaval and Loíza did raise the issue of debt indemnification in separate filings before the district court in 2006 and 2007, respectively. In issuing the final judgment order that this court reversed in Belaval IV, the district court concluded that Belaval's and Loíza's requests for debt indemnification were, by then, a "moot matter." 551 F.3d at 15. The fact that we ultimately reversed the district court's order in our Belaval IV decision does not, however, help the plaintiff FQHCs here because their appeal of the district court's entry of final judgment was limited to issues pertaining to wraparound payments and the 42 U.S.C. § 1396a(bb) formula. The plaintiffs' failure to preserve their claim for debt indemnification on appeal thus circumscribed the remaining live issues in that litigation to those

-39-

expressly-stated connection between the alleged "full risk" feature of the contracts and the question of how properly to address MCO debts.  Instead, the gist of plaintiffs' complaint remained the Commonwealth's failure to comply with the wraparound provisions of the Medicaid statute.  Thus, to the extent that plaintiff FQHCs rely on any "risk downloading" or "full risk" concerns expressed below to support their claim that the issue of debt indemnification is within the scope of this litigation, their claim fails.

## C.  Eleventh Amendment Sovereign Immunity

Shortly after this court issued its judgment in Belaval V, the Secretary filed an informative motion with the district court arguing that our decision in that appeal had "necessarily rejected" the district court's prior finding that the Secretary waived Eleventh Amendment immunity since 2006.  The Secretary's motion cited our Belaval V opinion, in which we stated that

> a federal court cannot ordinarily order money
> payments by a state to make up for past
> violations of a federal statute . . . : only
> if the state were disobeying a forward-looking

---

this court addressed (and remanded to the district court) in Belaval IV.  See United States v. Connell, 6 F.3d 27, 30 (1st Cir. 1993) ("Because the [appellate court's] mandate serves as a limitation on the power of the trial court, the issues that remain open on remand frequently will be circumscribed by the earlier appeal and by the appellate court's disposition of the issues therein."); see also Negrón-Almeda v. Santiago, 579 F.3d 45, 51 (1st Cir. 2009) (noting district court's entry of final judgment makes order "appealable[,] and the plaintiffs' failure to challenge it fits within the law of the case doctrine").

> court order to make such payments could a violation of that order be redressed by a federal court remedial directive to make payments to comply with the preexisting order.

625 F.3d at 19.

On November 8, 2010, the district court enjoined the Secretary to make wraparound payments to the plaintiff FQHCs. As part of its order, the district court made an about-face on its prior ruling that the Commonwealth had waived Eleventh Amendment immunity from 2006 through 2008 by means of its conduct in litigation before the court. The FQHCs also appeal the district court's ultimate finding on this issue. Before we conclude our discussion we are therefore called upon to determine whether the district court correctly found that the Commonwealth did not waive Eleventh Amendment immunity and that fourteen[13] of the nineteen original Plaintiff-Appellee FQHCs may only obtain relief as of the date of entry of the November 8, 2010 preliminary injunction onwards. Within the standard of review applicable in the preliminary injunction context, this presents a pure issue of law

---

[13] As noted in our discussion of the reimbursement formula above, Loíza and Belaval both obtained injunctive relief in 2004; it is therefore undisputed that they are entitled to reimbursement payments as of the respective dates that the district court issued judgments as to them. FQHCs Consejo, Río Grande, and Toa Alta Comprehensive Urban/Rural Advanced Health Services, Inc. have either settled their disputes regarding the Eleventh Amendment issue with the Secretary or are otherwise uninvolved in this aspect of the case.

-41-

that we review de novo.[14]  See Langlois v. Abington Hous. Auth., 207 F.3d 43, 47 (1st Cir. 2000); see also Entergy, Ark., Inc. v. Nebraska, 241 F.3d 979, 987 (8th Cir. 2001) (noting Court of Appeals considered "district court's decision to grant an injunction [] under [] abuse of discretion standard" but "reviewed de novo . . . legal conclusion that Nebraska had waived its Eleventh Amendment immunity").

We begin our analysis of the issue with the fundamental proposition that the FQHCs' claims against the Secretary have always been grounded on 42 U.S.C. § 1983.  See Belaval I, 397 F.3d at 72-75.  This important statute "imposes liability on anyone who, acting under color of state law, deprives a person of any 'rights, privileges, or immunities secured by the Constitution and laws.'"  Id. at 72 (quoting 42 U.S.C. § 1983).  Asserting a violation of federal law, however, will not always be enough to establish a § 1983 cause of action -- "[the] plaintiff must assert the violation of a federal right," Blessing v. Freestone, 520 U.S. 329, 340 (1997), and we look to the provision that a plaintiff

---

[14]  Because our review is de novo, we do not concern ourselves with the district court's interpretation of our opinion in Belaval V. Nor do we find it necessary to consider whether the district court's original judgment on this issue -- in which the court ruled that the Secretary had waived the Commonwealth's sovereign immunity -- has any bearing on the proper resolution of this question.  See United States v. Gen. Elec. Co., 670 F.3d 377, 384 n.6 (1st Cir. 2012) (noting, on de novo review, that the court "need not consider whether the specific reasoning set out by the district court contained errors" (quoting Euromotion, Inc. v. BMW of N. Am., Inc., 136 F.3d 866, 872 (1st Cir. 1998))).

seeks to enforce to determine whether it creates such a right, see Gonzaga Univ. v. Doe, 536 U.S. 273, 283-84 (2002). Our judgment in Belaval I, among other things, concluded that the portions of the Medicaid statute at issue in this litigation so did. See Belaval I, 397 F.3d at 74 (holding language found at 42 U.S.C. § 1396a(bb)(5)(A) "is rights-creating [] because it is mandatory and has a clear focus on the benefitted FQHCs").

The federal courts' powers to bring state officials into compliance with federally-recognized rights are not without limits. Relevant here, the Eleventh Amendment shields a State from being haled into federal court if it has not consented to the same.[15] See Pennhurst St. Sch. & Hosp. v. Halderman, 465 U.S. 89, 98 (1984). But the well-settled doctrine first laid out in Ex Parte Young, 209 U.S. 123 (1908), nonetheless recognizes the federal courts' power to enjoin a State's officers and "vindicate federal rights" if necessary. Pennhurst, 465 U.S. at 105. The doctrine's boundaries are well-defined, rendering it inapplicable "when 'the state is the real, substantial party in interest . . . .'" Id. at 101 (quoting Ford Motor Co. v. Dep't of Treas., 323 U.S. 459, 464 (1945)). As a result, "[i]n a 42 U.S.C. § 1983 action, the federal courts' remedial power 'may not include a retroactive award which requires

---

[15] This Circuit has consistently recognized that "Puerto Rico enjoys the same immunity from suit that a State has under the Eleventh Amendment." Maysonet-Robles v. Cabrero, 323 F.3d 43, 53 (1st Cir. 2003); see also Arecibo Cmty. Health Care, Inc. v. Com. of P.R., 270 F.3d 17, 21 n.3 (1st Cir. 2001).

the payment of funds from the state treasury.'" Echevarría-González v. González-Chapel, 849 F.2d 24, 32 (1st Cir. 1988) (quoting Fernández v. Chardón, 681 F.2d 42, 59 (1st Cir.), cert. denied, 459 U.S. 989 (1982)); see also Vaquería Tres Monjitas, Inc. v. Irizarry, 587 F.3d 464, 478 (1st Cir. 2009) (noting suits brought under the Ex Parte Young doctrine "may only seek prospective injunctive or declaratory relief; they may not seek retroactive monetary damages or equitable restitution").

Exceptions to this rigid rule are only allowed where Congress abrogates a State's sovereign immunity through valid legislation or when the State submits by waiving its immunity. See Va. Office for Prot. & Advocacy v. Stewart, 131 S. Ct. 1632, 1638 (2011); cf. Vaquería Tres Monjitas, 587 F.3d at 478 (noting "'line drawn by the Court represents a compromise between the impulse to preserve state autonomy and the need to enforce federal law'" (quoting Santiago v. Corporación de Renovación Urbana y Vivienda de P.R., 554 F.2d 1210, 1212 (1st Cir. 1977))). There are three ways in which a State may waive its immunity: "(1) by a clear declaration that it intends to submit itself to the jurisdiction of a federal court or administrative proceeding; (2) by consent to or participation in a federal program for which waiver of immunity is an express condition; or (3) by affirmative conduct in litigation." New Hampshire v. Ramsey, 366 F.3d 1, 15 (1st Cir. 2004). Latching on to the latter of these, the FQHCs argue that the Secretary so

waived any immunity that may attach to the Commonwealth through his conduct and good faith representations in federal court. Specifically, the FQHCs reason that the Secretary waived any protection that the Eleventh Amendment could bestow upon the Commonwealth from, at a minimum, June 2006 onwards. At that point, the Secretary made representations to the district court stating that the Commonwealth had set in place a system by which to process wraparound payments to the FQHCs and said payments would start being issued as of mid-2006. The FQHCs reason that the district court may therefore enjoin the Commonwealth to issue reimbursement payments as of that date.

The FQHCs' arguments on this issue are unavailing because they do not account for the well-settled principle that a State's waiver of its Eleventh Amendment immunity through conduct in litigation must be "unambiguous" and "evince a clear choice to submit [its] rights [to] adjudication by the federal courts." Ramos-Piñero v. Puerto Rico, 453 F.3d 48, 52 (1st Cir. 2006) (internal quotation marks omitted). While the Commonwealth has been embroiled in litigation regarding its failure to duly establish a PPS reimbursement payment scheme for the better part of the past decade, the Secretary has repeatedly asserted the Commonwealth's Eleventh Amendment rights to either litigate certain matters in its courts or otherwise protect its coffers from an imposition of liability. This conduct generally forecloses a

finding of consent or waiver. The Supreme Court's cases are as clear as they are consistent in holding that a State only waives its immunity under the Eleventh Amendment when it voluntarily entreats a federal court to adjudicate its rights. See Lapides v. Bd. of Regents of Univ. Sys. of Ga., 535 U.S. 613, 620 (2002) (holding State waived immunity where it "voluntarily agreed to remove the case to federal court"); Gardner v. New Jersey, 329 U.S. 565, 573-74 (1947) (holding State waived immunity where it "invoke[d] the aid" of bankruptcy court by filing a proof of claim); Clark v. Barnard, 108 U.S. 436, 447 (1883) (holding State waived Eleventh Amendment immunity where it chose to appear as intervenor); see also Ramsey, 366 F.3d at 16 (holding State waived Eleventh Amendment immunity where it invoked jurisdiction of a federal agency whose decisions were subject to review in federal court). That a State is haled into federal court as a defendant against its will and then defends itself once therein will not do. See Fla. Dep't of State v. Treasure Salvors, Inc., 458 U.S. 670, 683 n.18 (1982) ("The fact that the State appeared and offered defenses on the merits does not foreclose consideration of the Eleventh Amendment issue . . . .").

Here we cannot say that the Secretary voluntarily invoked the jurisdiction of the federal courts or otherwise waived its immunity by litigation conduct. The Commonwealth has consistently asserted its immunity to suit under the Eleventh Amendment, first

-46-

doing so in 2003 as a defense to the first group of FQHCs' action against it.  As to the specific representations that the FQHCs claim amounted to consent or waiver in 2006, we note that the Secretary first made statements that the Commonwealth had established a PPS reimbursement payment system and would begin making payments within the context of a June 27, 2006 informative motion to the district court that related only to the original suit involving plaintiffs Río Grande, Loíza, and Belaval.  At that point in the litigation, the district court had already enjoined the Secretary to set in place a PPS reimbursement payment system and commence making payments to Loíza and Belaval.  The June 27, 2006 motion purported to inform the court that the Secretary had, by then, established such a system and that for the system to be "fully operational" it "require[d] the cooperation of all FQHC[s] in providing . . . information" needed to start payments as of the third quarter of 2006.

In subsequent filings, however, the Secretary explained the Commonwealth's position that the preliminary injunction in place at the time should not be rendered permanent because, inter alia, the preliminary injunction relied upon an inaccurate formula. But importantly, the Secretary also then pressed his contention that once an injunction ordering that the Commonwealth to comply with the Medicaid statute issued, any disputes as to the proper calculation of past payments owed had to be litigated in the

-47-

Commonwealth's courts in accordance with the above-cited principle that, even though a federal court may indirectly cause State funds to be expended by means of ordering future compliance with federal law, it may not "impose upon the State 'a monetary loss resulting from past breach of a legal duty on the part of the defendant state officials.'" Verizon Md. Inc. v. Pub. Serv. Comm'n of Md., 535 U.S. 635, 646 (2002) (quoting Edelman, 415 U.S. at 668). The Secretary then raised this Eleventh Amendment-based argument in each of the cases brought by the distinct groupings in the not-as-of-yet consolidated actions, and, specifically, in the respective actions relevant to the fourteen FQHCs that now cross-appeal the district court's November 8, 2010 ruling on this issue.

Surveying the Secretary's litigation conduct insofar as it can be gleaned from the record before us, we simply cannot agree with the FQHCs' reasoning that the Secretary "unquestionably consented" to make payments from the Commonwealth's coffers as early as the third quarter of 2006. As our own case law commands, any such waiver would require the Commonwealth to have "engag[ed] in affirmative conduct during litigation sufficient to evince conduct to suit." Bergemann v. R.I. Dep't of Envtl. Mgmt., 665 F.3d 336, 340 (1st Cir. 2011). A finding of waiver or consent through conduct in litigation is simply foreclosed where, instead of voluntarily invoking federal jurisdiction, a State does nothing more than zealously defend against the same whenever possible.

### III. <u>Conclusion</u>

We make a few parting comments regarding our judgment to remand for additional consideration on the formula that will be used to calculate the Commonwealth's reimbursement obligations. This decision is not lightly reached: we are mindful that our judgment today imposes further burden on the district court and postpones the eventual resolution of this long-enduring litigation. But the stakes here are undeniably high -- the tangible effects of this litigation involve multiples of millions of dollars and bear on the health care of thousands of Medicaid beneficiaries in Puerto Rico. On remand, we urge the parties to assist the district court in its efforts to bring this controversy to an efficient and just conclusion.

For the reasons we have explained above, we **<u>affirm</u>** the district court's ruling on the Eleventh Amendment claims. We also **<u>affirm</u>** its ruling regarding the plaintiffs' request for debt indemnification relief. We **<u>reverse</u>** the district court's judgments regarding the formula used to calculate the Commonwealth's reimbursement obligations and **<u>remand</u>** for further proceedings consistent with this opinion. All parties will bear their own costs.

**It is so ordered.**